1   M. RANDALL OPPENHEIMER (S.B. #77649)
    roppenheimer@omm.com
2   CATALINA J. VERGARA (S.B. #223775)
    cvergara@omm.com
3   O'MELVENY & MYERS LLP
    400 S. Hope Street
4   Los Angeles, CA 90071-2899
    Telephone:    (213) 430-6000
5   Facsimile:    (213) 430-6407

6   BRIAN D. BOYLE (S.B. #126576)
    bboyle@omm.com
7   O'MELVENY & MYERS LLP
    1625 Eye Street, NW
8   Washington, DC  20006
    Telephone:    (202) 383-5300
9   Facsimile:    (202) 383-5414

10  Attorneys for Defendants
    CHEVRON CORPORATION and
11  CHEVRON CORPORATION ESIP
    INVESTMENT COMMITTEE

12

                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                          OAKLAND DIVISION
15

16
    CHARLES E. WHITE, JR., *et al.*,        Case No.  4:16-cv-00793-PJH
17
                    Plaintiffs,              **DEFENDANTS' NOTICE OF MOTION
18                                           AND MOTION TO DISMISS
                                             PLAINTIFFS' COMPLAINT;
19         v.                                MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT THEREOF**
    CHEVRON CORPORATION, *et al.*,
20
                    Defendants.              Date:         May 25, 2016
21                                           Time:         9:00 a.m.
                                             Judge:        Hon. Phyllis J. Hamilton
22                                           Courtroom:    3, 3rd Floor

23                                           Complaint Filed: February 17, 2016
                                             Trial Date:      None set
24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 2

I.    INTRODUCTION AND ISSUES TO BE DECIDED ......................................... 2

II.   STATEMENT OF RELEVANT FACTS ............................................................ 4

III.  LEGAL STANDARD .......................................................................................... 6

IV.   ARGUMENT ....................................................................................................... 7

A.   Plaintiffs' Summary "Disloyalty" Claims Must Be Dismissed Because Plaintiffs Do Not Allege A Single Fact From Which Disloyalty Could Be Inferred. ........................................................................................................ 7

B.   No Court Has Held That ERISA Requires A Plan To Offer A Stable Value Fund, As The Complaint Attempts To Establish As A Matter Of Law. ................. 8

C.   There Are No Facts That Support Plaintiffs' Allegation That The Plan Fiduciaries Were Imprudent In Their Selection Of The Plan's Remaining Investment Options. ............................................................................... 14

1.   The Fiduciaries' Choice Of Retail-Class Mutual Funds Was Not An Abuse Of Their Discretion. ........................................................ 14

2.   The Fiduciaries Did Not Abuse Their Discretion In Offering Non-Vanguard Funds To Complement The Lineup's Broad Array Of Vanguard Options. ....................................................... 16

3.   It Was Not Imprudent For The Plan Fiduciaries To Include Mutual Funds In The Plan Lineup. ......................................................... 17

D.   The Complaint Does Not Plausibly Allege Any Imprudence In The Plan's Revenue-Sharing Arrangement With Vanguard. ................................... 19

E.   There Was No Abuse Of Discretion In The Timing Of The Removal Of The Artisan Small Cap Value Fund. ............................................................. 21

1.   The Mere Fact That An Investment Has Performed Poorly Does Not Support A Plausible Inference That The Fiduciaries Failed To Monitor The Investment. ............................................................ 21

2.   Plaintiffs' Allegations Respecting The Fund's Performance Before 2014 Are Contrary To Judicially Noticeable Facts. ............................... 23

F.   Plaintiffs' Monitoring Claim Fails. ............................................................ 24

V.    CONCLUSION .................................................................................................. 25

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Lockheed Martin Corp.*,
  725 F.3d 803 (7th Cir. 2013)................................................................................10

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
  446 F.3d 728 (7th Cir. 2006)..........................................................................7, 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. *passim*

*Bash v. Firstmark Standard Life Ins. Co.*,
  861 F.2d 159 (7th Cir. 1988)...............................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................6

*Bell v. Pension Committee of ATH Holding Company, LLC.*,
  No. 15-cv-2062-TWP-MPB (S.D. Ind. filed Dec. 29, 2015) ..................................3

*Bowers v. BB&T Corp.*,
  No. 1:15-cv-732-CCE-JEP (M.D.N.C. filed Sept. 4, 2015)...............................3, 4

*In re Calpine Corp.*,
  No. C-03-1685-SBA, 2005 WL 1431506 (N.D. Cal. Mar. 31, 2005)....................25

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006).................................................................................7

*DeBruyne v. Equitable Life Assurance Soc'y of U.S.*,
  920 F.2d 457 (7th Cir. 1990)................................................................13, 22, 23

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982).................................................................................7

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014) ........................................................................................7

*George v. Kraft Foods Global, Inc.*,
  641 F.3d 786 (7th Cir. 2011)..............................................................................20

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)..............................................................................6

*Glennie v. Abitibi-Price Corp.*,
  912 F. Supp. 993 (W.D. Mich. 1996)...................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*GMC v. Tracy*,
  519 U.S. 278 (1997) ..................................................................................................13

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009)................................................................................ *passim*

*In re HP ERISA Litig.*,
  58 Employee Benefits Cas. (BNA) 1297 (N.D. Cal. 2014) ....................................24

*Ileto v. Glock, Inc.*,
  349 F.3d 1191 (9th Cir. 2003)...................................................................................6

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006)...................................................................................21

*In re Lehman Bros. Securities & ERISA Litigation*,
  113 F. Supp. 3d 745 (S.D.N.Y. 2015) .....................................................................22

*Loomis v. Exelon*,
  658 F.3d 667 (7th Cir. 2011).............................................................................. *passim*

*In re McKesson HBOC Inc. ERISA Litig.*,
  391 F. Supp. 2d 812 (N.D. Cal. 2005) ......................................................................8

*Pledger v. Reliance Trust Co.*,
  No. 1:15-CV-4444-MHC (N.D. Ga. filed Dec. 22, 2015) .....................................3, 4

*Ramos v. Banner Health*,
  No. 1:15-cv-02556-WJM-MJW (D. Colo. filed Nov. 20, 2015) ...........................3, 4

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011)................................................................................ *passim*

*Rinehart v. Akers*,
  722 F.3d 137 (2d Cir. 2013), *vac'd on other grounds*, 134 S. Ct. 2900 (2014).......................24

*Rinehart v. Lehman Bros. Holdings Inc.*,
  No. 15-2229, 2016 U.S. App. LEXIS 5114 (2d Cir. Mar. 18, 2016)................................22, 24

*Romero v. Nokia, Inc.*,
  No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ...............................7, 8, 24

*Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.*,
  712 F.3d 705 (2d Cir. 2013)................................................................................ *passim*

*Stewart v. Nat'l Shopmen Pension Fund*,
  795 F.2d 1079 (D.C. Cir. 1986) .............................................................................13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015) ...........................................................................................6, 7

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823
  (2015) ........................................................................................................... *passim*

*Troudt v. Oracle Corp.*,
  Case No. 1:16-cv-00175-REB-CBS (D. Colo. filed Jan. 22, 2016) ...........................3

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014)....................................................................................20

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996).......................................................................................12

*Young v. GM Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009)................................................................................20

**Statutes**

ERISA § 404, 29 U.S.C. § 1104 ...................................................................................6

Investment Company Act of 1940, 15 U.S.C. §§ 80a-1–80a-64 ...................................18

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ..........................................................18

**Regulations**

29 C.F.R. § 2509.75-8, FR-17.....................................................................................25

29 C.F.R. § 2550.404a-1(b)(i)-(ii) ..............................................................................12

29 C.F.R. § 2550.404c-1(b)(1)(ii)...............................................................................10

29 C.F.R. § 2550.404c-1(b)(2).....................................................................................10

29 C.F.R. § 2550.404c-1(b)(3).....................................................................................10

72 Fed. Reg. 60,452 ....................................................................................................10

72 Fed. Reg. 60,463 ....................................................................................................10

72 Fed. Reg. 60,473 ....................................................................................................12

**Rules**

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 6

iv

## NOTICE OF MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on May 25, at 9:00 a.m. or on the date and time ordered by the Court, in Courtroom 3 at the United States Courthouse, 1301 Clay Street, Oakland, California 94612, 3rd Floor, the Honorable Phyllis J. Hamilton presiding, Defendants Chevron Corporation and the Chevron Corporation ESIP Investment Committee will and hereby do move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the First, Second, Third, Fourth, and Fifth Counts of the Complaint filed by Plaintiffs Charles E. White, Jr., John P. Jacobs, Verlan D. Hoopes, Nora L. Pennington, James A. Ray, and Jeannette A. Finley, individually and as representatives of a class of participants and beneficiaries in the Chevron Employee Savings Investment Plan.

Defendants bring this motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that plaintiffs fail to allege sufficient facts to plausibly support their claims for breach of defendants' fiduciary duties. This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Catalina Vergara and the Request for Judicial Notice, the pleadings in this action, and such other materials and evidence as may be presented to the Court.

Dated: April 18, 2016

M. RANDALL OPPENHEIMER
BRIAN D. BOYLE
CATALINA J. VERGARA
O'MELVENY & MYERS LLP

By: /s/
    Catalina J. Vergara

Attorneys for Defendants
CHEVRON CORPORATION and
CHEVRON CORPORATION ESIP
INVESTMENT COMMITTEE

1

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION AND ISSUES TO BE DECIDED

During the six-year period challenged in the Complaint, the Chevron Corporation ("Chevron") Employee Savings Investment Plan (the "ESIP" or the "Plan") grew from $13 billion to $19 billion, reflecting solid results for Plan participants.  The Plan offered a diversified lineup of investment options to participants and adhered to a fiduciary process that resulted in continual adjustments to the Plan's investment selections, cost structure, and recordkeeping arrangements. That much is evident from the facts alleged in the Complaint.  Far from describing a broken process or neglectful fiduciaries, the Complaint reveals active, attentive, and unconflicted decision-making by Plan officials.

Yet the six Plan participants who have brought this lawsuit complain that they might have fared better had the Plan fiduciaries made different choices.  Their Complaint asserts that the Plan offered a money market fund as a capital preservation option, when plaintiffs would have preferred a stable value fund; the Plan's investment lineup included mutual funds, including some actively-managed funds, when plaintiffs would have limited the options to funds with bargain-basement investment management fees; the Plan used revenue sharing to compensate its recordkeeper, Vanguard, when plaintiffs would have used a fixed fee; and the Plan offerings included an investment option that plaintiffs would have removed from the lineup sooner than the Plan fiduciaries did because of the mixed performance record it developed over time.

That plaintiffs claim, in hindsight, that they might have made different investment choices than the Plan fiduciaries did is of no consequence as a matter of law.  The law provides no recourse to plaintiffs who would have the courts second-guess economic returns after-the-fact, as plaintiffs ask this Court to do.  Plaintiffs cloak their allegations in five counts alleging breaches of the fiduciary duties of loyalty and prudence, yet they plead no facts to establish a breach of either duty.  The duty of loyalty requires plan fiduciaries to act solely in the interest of plan participants and beneficiaries, and here plaintiffs allege no facts whatsoever to suggest that the Plan fiduciaries acted on behalf of any interests *other than* those of the Plan participants.  Likewise, plaintiffs offer nothing but conclusory labels and unsupported inferences to attempt to support

their prudence claims.  The duty of prudence is concerned with process, not results, and here the undisputed facts show that the Plan fiduciaries met their obligation to make considered judgments:  Utilizing their discretion, they opted for the safety and liquidity of a money market fund, a mainstream option offered by the majority of 401(k) plans, instead of a stable value option that might have offered potentially higher returns at the expense of greater restrictions on participants' trading.  They included in the Plan lineup a broad selection of funds with a variety of risk/reward, investment strategy, and cost profiles, to give participants maximum flexibility. They used revenue sharing (a common compensation mechanism) to compensate the Plan's recordkeeper, before switching to a fixed fee arrangement (a different common compensation mechanism).  And they opted to closely monitor the choppy performance of a Morningstar "Gold" rated fund for a period of time before dropping it.  Plaintiffs allege ***no facts*** suggesting that the fiduciaries brought an impaired process—conflicted or imprudent—to bear on any of these discretionary judgments.  That failure dooms their claims.

The shallowness of plaintiffs' factual allegations may simply reflect that this Complaint is the latest in a string of cookie-cutter complaints brought by plaintiffs' attorneys targeting the sponsors of 401(k) plans with billions of dollars in assets under management.[1]  Here, their boilerplate claims are so divorced from reality—and so thin on the facts—that they fail as a matter of law.  In fact, courts have routinely dismissed claims brought on the theories advanced by plaintiffs in this case.  *E.g.*, *Pension Benefit Guar. Corp. ex rel. St. Vincent v. Morgan Stanley Inv. Mgmt.* ("*St. Vincent*"), 712 F.3d 705, 716 (2d Cir. 2013) (affirming dismissal of claim that plan fiduciaries made imprudent investment decisions); *Renfro v. Unisys Corp.*, 671 F.3d 314, 326–28 (3d Cir. 2011) (affirming dismissal of claims that fiduciaries should have selected a different mix of investment options); *Loomis v. Exelon*, 658 F.3d 667, 671 (7th Cir. 2011)

---

[1] *See*, *e.g.*, *Ramos v. Banner Health*, No. 1:15-cv-02556-WJM-MJW (D. Colo. filed Nov. 20, 2015); *Bowers v. BB&T Corp.*, No. 1:15-cv-732-CCE-JEP (M.D.N.C. filed Sept. 4, 2015); *Pledger v. Reliance Trust Co.*, No. 1:15-CV-4444-MHC (N.D. Ga. filed Dec. 22, 2015); *Bell v. Pension Committee of ATH Holding Company, LLC.*, No. 15-cv-2062-TWP-MPB (S.D. Ind. filed Dec. 29, 2015); *Troudt v. Oracle Corp.*, No. 1:16-cv-00175-REB-CBS (D. Colo. filed Jan. 22, 2016).

(affirming dismissal of claims that plan fiduciaries should have offered institutional investment vehicles in lieu of higher-priced retail mutual funds); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal of claims that fiduciaries violated ERISA by offering investment options with excessive fees).

Plaintiffs' shopworn claims do not fit the Chevron Plan for an additional reason: Plaintiffs attack Vanguard, Chevron's recordkeeper and principal investment manager, as high-priced, whereas their counsel have consistently touted Vanguard as the low-cost gold standard in other cases.[2] For years, plaintiffs' counsel have praised Vanguard funds as "lower cost" alternatives to the investment options offered by other plans—yet, in the height of irony, they now fault Chevron for using Vanguard, which is known throughout the financial world as a high quality, low-cost provider. Even putting this glaring contradiction aside, the Complaint is silent on what amounts were paid to Vanguard here and what amounts would have been reasonable. The Complaint's failure to compare Vanguard's compensation to market alternatives is fatal to the recordkeeping fee claim, which presupposes that Vanguard's fees were *excessive* relative to what the market would have supported.

By its own terms, plaintiffs' Complaint permits no plausible inference of wrongdoing. As explained further below, the action should be dismissed in its entirety.

## II.   STATEMENT OF RELEVANT FACTS

One way Chevron offers retirement benefits to its employees is through the ESIP, an employer-sponsored, individual-account, defined contribution plan, which had over 40,000 participants as of December 31, 2014. Compl. ¶¶ 7, 11. The Plan is funded not only through employee-directed contributions, but also through generous matching contributions from Chevron

---

[2] *See*, *e.g.*, Declaration of Catalina Vergara ("Vergara Decl."), Ex. A (*Bowers* Am. Compl.) at ¶¶ 69–70 (alleging that "[t]he fees for the Plan's investment options were up to *14 times more expensive* than available Vanguard alternatives in the same investment style" (emphasis in original)); Ex. B (*Pledger* An. Compl.) at ¶¶ 89–91 (alleging "the fees for the Plan's investment options then in the Plan were up to *16 times* more expensive than available Vanguard alternatives in the same investment style" (emphasis in original) and showing plan's investment options were up to *4820% more expensive* than their Vanguard comparators); Ex. C (*Ramos* Compl.) at ¶ 65 (alleging that "[t]he fees for the Plan's investment options were up to *41 times more expensive* than comparable Vanguard alternatives" (emphasis in original)).

1   itself, ranging as high as 8% of an employee's income, up to IRS annual limits.  *Id.* ¶ 9; Vergara

2   Decl., Ex. D (Plan Document) at 21.  The Plan is one of the largest of its kind.  Compl. ¶ 2.  It is

3   also quite successful.  As plaintiffs acknowledge, Plan assets grew from $13 billion to $19 billion

4   over the alleged class period.  *Id.* ¶¶ 2, 86.

5          The Plan offers a broad menu of investment options to Plan participants.  During the

6   alleged class period, participants could allocate their accounts among sixteen to eighteen core

7   funds, a Chevron stock fund, and thousands of additional investments made available through a

8   brokerage option.  *See* Vergara Decl., Exs. E–I (ESIP 2010–2014 Form 5500s).[3]  The Plan lineup

9   included a variety of actively-managed choices, as well as a number of Vanguard index funds in

10  various market segments such as balanced funds and total bond or total stock funds; funds

11  focused on growth or on fixed income or both; and funds invested in large-cap, small-cap,

12  domestic, and international stocks.  *Id.*  Participants also had a choice of twelve Vanguard-

13  managed target-date collective trusts, a non-Vanguard collective trust, three non-Vanguard

14  mutual funds, a fixed-income separate account, and a money market fund.  Compl. ¶¶ 26, 33.

15         Over the alleged class period, Plan officials actively supervised the investment choices

16  offered to Plan participants, removing certain options and adding others.  *See*, *e.g.*, *id.* ¶¶ 49–51,

17  64–66, 68–69 (identifying funds removed in 2012, 2014, and 2015).  For example, in 2012, the

18  Plan removed the BlackRock Small Cap Growth Fund and replaced it with the Neuberger Berman

19  Genesis Institutional shares.  *See* Vergara Decl., Ex. G (2012 Form 5500) at 16.  In 2012, the Plan

20  added a separate account option, and, in 2013, it added target date fund collective trusts.  Compl.

21  ¶¶ 69, 76.  On April 1, 2014, the Plan removed the Artisan Small Cap Value Fund.  *Id.* ¶ 92.

22         At least twice over the alleged class period—in 2010 and again in 2012—the Plan also

23  transitioned a number of its funds to lower-expense share classes.  *See e.g.*, *id.* ¶¶ 33, 47–53;

24  Vergara Decl., Ex. E (2010 Form 5500) at 14, Ex. G (2012 Form 5500) at 16.  And in 2012, the

25  Plan implemented a new recordkeeping arrangement with Vanguard, pursuant to which Vanguard

26

27  [3] As explained in defendants' Request for Judicial Notice ("RJN"), on a motion to dismiss, the
    Court may consider plan-related materials outside of the Complaint that are central to the
    plaintiffs' claims and whose authenticity is not in dispute.  RJN at 4.

28

1  is compensated for administrative services through a flat, per-participant recordkeeping fee rather

2  than through a share of the expense ratios charged under the Plan's investment options (so-called

3  "revenue sharing").  *See* Compl. ¶ 86; *compare* Vergara Decl., Ex. F (2011 Form 5500) at 29

4  ("Trustee and recordkeeping fees are netted from the net asset values.") *with id.* Ex. G (2012

5  Form 5500) at 31 ("[B]eginning plan year 2012, recordkeeping and trustee fees are unbundled

6  and paid by the participants.").

7      In this action, six Plan participants purport to bring claims on behalf of participants and

8  beneficiaries in the Plan and on behalf of the Plan itself.  Compl. ¶¶ 1, 12–17.  They assert five

9  claims under ERISA § 404(a), 29 U.S.C. § 1104(a), for alleged breaches of the Plan fiduciaries'

10  duties of loyalty, prudence, and monitoring.  As explained below, each of plaintiffs' five counts

11  fails to state a claim upon which relief may be granted, and must be dismissed as a matter of law.

12  **III.    LEGAL STANDARD**

13      A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal

14  sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199–1200

15  (9th Cir. 2003).  To survive such a motion, "a complaint must contain sufficient factual matter,

16  accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

17  U.S. 662, 678 (2009).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

18  relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

19  cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While the

20  Court must accept well-pleaded facts as true, it need not accept "allegations that are merely

21  conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec.*

22  *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Instead, the allegations in the complaint "must be

23  enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citations

24  and quotations omitted).

25      These standards take on particular significance in the context of the ERISA claims put

26  forward here.  A claim of fiduciary imprudence under ERISA requires a plaintiff to allege facts

27  showing that the fiduciary did not act "with the care, skill, prudence, and diligence that a prudent

28  person acting in a like capacity and familiar with such matters would use."  *Tibble v. Edison Int'l*

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1   ("*Tibble II*"), 135 S. Ct. 1823, 1828 (2015) (quotations omitted).  Fiduciary decision-making

2   typically requires "balancing of competing interests under conditions of uncertainty," and

3   ERISA's duty of prudence does not seat fiduciaries on a "razor's edge" in striking that balance.

4   *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 733 (7th Cir. 2006); *see also Chao v.*

5   *Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (noting that the prudent person standard does not

6   require a fiduciary to take "any particular course of action if another approach seems preferable"

7   (quotation omitted)).  Rather, the exercise of fiduciary discretion is reviewed "deferentially" for

8   an "abuse of discretion," *Armstrong*, 446 F.3d at 733, in light of "the circumstances . . . prevailing

9   at the time the fiduciary act[ed]," *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471

10  (2014) (citation and quotations omitted).  In short, a fiduciary's prudence is judged by process,

11  not outcome.  *Tibble v. Edison Int'l* ("*Tibble I*"), 729 F.3d 1110, 1136 (9th Cir. 2013), *vacated on*

12  *other grounds*, *Tibble II*, 135 S. Ct. 1823 (2015).  "[T]he primary question is whether the

13  fiduciaries, at the time they engaged in the challenged transactions, employed the appropriate

14  methods to investigate the merits of the investment and to structure the investment."  *Id.*

15  **IV.    ARGUMENT**

16          **A.     Plaintiffs' Summary "Disloyalty" Claims Must Be Dismissed Because
                    Plaintiffs Do Not Allege A Single Fact From Which Disloyalty Could Be
17                  Inferred.**

18          Plaintiffs caption each of their four principal counts as nominal "disloyalty" claims, not

19  simply claims of imprudence.  *See* Compl. ¶¶ 114, 118, 122, 126; *see also id.* ¶¶ 37, 47, 55

20  (alleging "disloyalty" in conclusory terms).  ERISA does impose on plan fiduciaries an obligation

21  to act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), but

22  plaintiffs have not pleaded a single fact that allows the inference that the Plan fiduciaries ever

23  discharged their duties with anything other than "an eye single to the interests of the participants

24  and beneficiaries."  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

25          Plaintiffs' disloyalty claims "hinge[]" instead "on the prudence-based allegations" in the

26  Complaint, and "do[] [not] present any separate allegations regarding any loyalty breach"—such

27  that they must be dismissed, as this Court recognized in *Romero v. Nokia, Inc.*, Case No. C 12-

28  6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (Hamilton, J.).  Plaintiffs'

1   complaints about the selection of a money market fund instead of a stable value fund, about the

2   Plan's administrative and investment-management expenses, and about the replacement of the

3   Artisan Small Cap Value Fund are all fundamentally prudence challenges.  None of these

4   allegations so much as implies that defendants acted for anyone's interest other than the Plan

5   beneficiaries, or identifies *any* benefit to anyone other than the Plan participants, much less any

6   benefit to Chevron or the Plan fiduciaries.  This case is thus on all fours with *Loomis v. Exelon*,

7   658 F.3d 667, 671 (7th Cir. 2011), where the Seventh Circuit dismissed disloyalty claims on the

8   ground that there was "no reason to think" that the defendant chose particular investment options

9   "to enrich itself at participants' expense."  *Id.* at 671.

10      Simply attaching a "disloyalty" label to the counts in the Complaint does not mean

11   plaintiffs can proceed with disloyalty claims.  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers

12   labels and conclusions . . . will not do." (internal quotations omitted)).  The duties of loyalty and

13   prudence are separate and distinct, and must be pleaded separately.  This Court and others have

14   not hesitated to dismiss disloyalty claims that merely attempt to piggyback on other theories of

15   fiduciary breach.  *Romero*, 2013 WL 5692324, at *5 (dismissing claim for breach of the duty of

16   loyalty that did not "present any separate allegations regarding any loyalty breach"); *In re*

17   *McKesson HBOC Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 834–35 (N.D. Cal. 2005) (noting that

18   the "duty of loyalty requires fiduciaries to refrain from actual disloyal conduct, not simply the

19   risk that such behavior will occur," and dismissing disloyalty claim premised on such a risk).

20   Here, where the Complaint does not contain so much as a whiff of conflicted conduct, the

21   purported disloyalty claims must be dismissed *in totem*.

22
23   **B.   No Court Has Held That ERISA Requires A Plan To Offer A Stable Value
        Fund, As The Complaint Attempts To Establish As A Matter Of Law.**

24      Count I of the Complaint challenges the ESIP Investment Committee's choice of a money

25   market fund—a mainstream, established offering that is without question an accepted investment

26   strategy—to serve as the Plan's conservative option.  Compl. ¶¶ 27–38, 114.  They contend, in

27   hindsight, that a stable value fund would have delivered higher returns during the alleged class

28   period.  *Id.*  There is no disagreement that the Plan's money market option succeeded in

8

1    preserving invested principal and providing returns on that principal consistent with short-term

2    interest rates, as money market funds are designed to do.  Yet plaintiffs categorically condemn

3    money market funds as 401(k) plan investment options because their relatively modest returns

4    never (as plaintiffs see it) justify their use in a retirement plan.  Plaintiffs' attempt to mandate

5    stable value offerings over money market funds not only flies in the face of conventional

6    investment wisdom but is also meritless as a matter of law, as Ninth Circuit case law and

7    Department of Labor regulations and guidance establish beyond dispute.

8         Confronted with just such a claim in *Tibble v. Edison Int'l*, the Ninth Circuit expressly

9    rejected the contention that "it was imprudent for [a plan fiduciary] to include a short-term

10   investment fund"—akin to a money market fund—"rather than a stable value fund" in a 401(k)

11   plan lineup.  *Tibble I*, 729 F.3d at 1136; *see also Hecker*, 556 F.3d at 586 ("nothing in [ERISA]

12   requires plan fiduciaries to include any particular mix of investment vehicles in their plan").  In

13   *Tibble I*, as here, the plaintiffs attempted to establish the imprudence of the fiduciaries'

14   investment choice based on hindsight outcomes, but the Court held that, in evaluating the

15   prudence of an investment decision, "the primary question is whether the fiduciaries, at the time

16   they engaged in the challenged transactions, employed the appropriate methods to investigate the

17   merits of the investment and to structure the investment."  729 F.3d at 1136.  Because evidence in

18   that case showed that the investment team discussed "the pros and cons of a stable-value

19   alternative" before opting for a short-term investment fund alternative, the plaintiffs' fiduciary

20   breach claim failed.  *Id.*

21        Here, plaintiffs allege in conclusory terms that the fiduciaries did not use reasoned

22   decision-making to select a money market option instead of a stable value option, Compl. ¶¶ 37,

23   114, but they allege no facts to support that conclusion.  In essence, they ask this Court to infer an

24   imprudent process from the decision *itself*, a claim that collapses into—and with—their *per se*

25   imprudence theory.  As the Second Circuit recognized in *St. Vincent*, a complaint that lacks

26   "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a

27   motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably

28   infer from what is alleged that the process was flawed."  712 F.3d at 718, 727 (quotation omitted).

1   No such inference can be made in this case.

2          Plaintiffs also attempt to link their process challenge to the Plan's Investment Policy

3   Statement ("IPS"), suggesting that it required a stable value option, but that document offers no

4   support for their claim at all.   The IPS provides that "[a]t least one fund will provide for a high

5   degree of safety and capital preservation," directs that all Plan options must be liquid and daily-

6   valued, and promotes participant flexibility in allocating their accounts.  Vergara Decl., Ex. J

7   (IPS) at 1, 5.  The inclusion of a money market option is consistent with the IPS guidance,

8   making plaintiffs' attempt to infer an imprudent process from its offering implausible.  *See Tibble*

9   *I*, 729 F.3d at 1136 (rejecting imprudence challenge where investment team "determined that a

10  short-duration bond fund already on the menu filled the same investment niche as would have a

11  stable value fund"); *Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a

12  sheer possibility that a defendant has acted unlawfully." (citations and quotation omitted)).[4]

13         Plaintiffs' attack on money market funds fails for the additional reason that the

14  Department of Labor ("DOL") has explicitly recognized that such funds, like stable value funds,

15  can "play an important role as a component of a diversified portfolio" and "may be prudent for

16  some participants or beneficiaries."  72 Fed. Reg. 60,452, 60,463, (Oct. 24, 2007).  Moreover,

17  DOL regulations encourage plan sponsors to include at least one "safe" option in an investment

18  lineup, *viz.*, an "income producing, low risk, liquid" investment, 29 C.F.R. § 2550.404c-

19  1(b)(1)(ii), (b)(2), (b)(3), and a money market fund provides each of those features—it produces

20  income, is very low risk, and is highly liquid, as plaintiffs' Complaint accepts.  The DOL's

21  guidance thus plainly permits plan sponsors to include money market funds in their plan lineups,

22  where they are open to selection by plan participants according to their individual investment

23  needs and preferences.

24         Here in particular, Plan participants could decide for themselves whether to invest in the

25  ───────────────

26  [4] The Complaint's attempt to invoke *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803 (7th Cir.
    2013), is equally off the mark.  *Abbott* dealt with a claim that a purported stable value fund
27  "failed to conform to th[e] general description" of a stable value fund.  *Id.* at 806.  There is no
    such "false advertising" claim here; to the contrary, the essence of plaintiffs' claim is that the
28  money market option performed exactly as expected.

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1   money market option or whether to allocate their accounts to higher-risk options with potential

2   for greater returns, including options with only moderately higher risk profiles, such as the Plan's

3   short-term bond fund, its inflation-protected bond index fund, or its income fund, which was

4   primarily invested in high-quality bonds and other debt securities.  *See* Compl. ¶ 26; *see also*

5   Vergara Decl., Ex. K (Dodge & Cox Funds, *Income Fund Overview*).[5]  The offering of a money

6   market fund as one of an array of mainstream investment options along the risk/reward spectrum

7   more than satisfied the Plan fiduciaries' duty of prudence.  *Loomis*, 658 F.3d at 673–74

8   (dismissing investment lineup challenge, noting that a fiduciary that "offer[s] participants a menu

9   that includes high-expense, high-risk, and potentially high-return funds, together with low-

10   expense index funds that track the market, and low-expense, low-risk, modest-return bond funds

11   . . . has left choice to the people who have the most interest in the outcome, and it cannot be

12   faulted for doing this.").

13       Plaintiffs nevertheless urge that, in today's low-interest environment, plan sponsors are

14   compelled to maximize the income produced by a "safe" plan option by offering a stable value

15   fund instead of or in addition to a money market fund.  Yet they ignore that stable value investing

16   requires risk and liquidity tradeoffs.  As plaintiffs acknowledge, stable value funds are limited to

17   retirement plans with longer investment horizons and typically invest in longer-duration securities

18   than money market funds.  Compl. ¶ 27.  Longer-duration investments, by their nature, constrain

19   liquidity.  Stable value providers thus commonly limit the ability of plans or plan participants to

20   withdraw their accounts from the stable value fund—delaying payment or imposing monetary

21   penalties for withdrawal—and often further restrict participants from transferring investments

22   from a stable value fund to other fixed-income investment options.[6]  Money market options like

23   that offered by the Plan do not limit liquidity or participant investing in this way and, as plaintiffs

24

25   [5] Prospectuses and similar fund materials are judicially noticeable.  RJN at 4–5.

26   [6] *See* Vergara Decl., Ex. L (GAO Stable Value Report) (noting stable value providers "typically
require certain restrictions on plan sponsor and participant withdrawals or transfers of plan assets
from stable value funds"); Ex. M (DOL Stable Value Report); Ex. N (Office of the Comptroller

27   of the Currency, *Comptroller's Handbook*).  Information that is publicly available on government
websites is judicially noticeable.  RJN at 5.

28

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1    concede, are open to all investors.  Compl. ¶ 27.

2         Stable value funds similarly pose different risks than do money market funds.  They are

3    not risk free.  The DOL has discussed some of the risks of stable value investing, including

4    exposure "to the credit risk of the fund vendor," vulnerability to "changes in interest rates," and

5    dependence on the "financial stability of the wrap contract provider" that insures the stable value

6    fund's holdings.  72 Fed. Reg. at 60473 n.35; DOL ERISA Advisory Council, *Report on Stable*

7    *Value Funds and Retirement Security in the Current Economic Conditions* (2009).[7]  The risk of

8    wrap provider failure in particular is highlighted by the many cases in which retirement assets

9    were trapped in an insurance company wind-up.  *In re Unisys Sav. Plan Litig.*, 74 F.3d 420 (3d

10   Cir. 1996) (litigation involving failure of Executive Life insurance company); *Glennie v. Abitibi-*

11   *Price Corp.*, 912 F. Supp. 993, 995 (W.D. Mich. 1996) (same, involving Mutual Benefit Life

12   Insurance Company).  Money market funds do not pose these risks.  72 Fed. Reg. at 60,473 n.35

13   ("money market funds reasonably represent available near risk-free investment instruments").

14        Plaintiffs' insistence that the Plan fiduciaries were legally compelled to pursue extra

15   returns at the expense of participants' freedom to reallocate their accounts—and by exposing the

16   plan and participants to the risks of stable value investing to boot—is inconsistent with prudence

17   principles.  A prudent fiduciary is obliged to consider the full range of an investment's features,

18   not just its potential for returns—particularly for an investment whose chief purpose is to preserve

19   capital against loss, not to deliver spectacular returns (or spectacular risk).  *See*, *e.g.*, 29 C.F.R.

20   § 2550.404a-1(b)(i)-(ii) (prudent fiduciary must give "appropriate consideration to those facts and

21   circumstances that . . . are relevant to the particular investment or investment course of action

22   involved, including the role the investment or investment course of action plays in that portion of

23   the plan's investment portfolio with respect to which the fiduciary has investment duties").

24        Moreover, plaintiffs' narrow focus on the relative performance of stable value and money

25

---

26   [7] *See also* Vergara Decl., Ex. L (GAO Stable Value Report) at 23 (explaining transfer restrictions
     imposed by stable value fund managers); Ex. M (DOL Stable Value Report) (explaining, *inter*
27   *alia*, that "[u]ltimately, the financial stability of the wrap contract provider(s) may be a factor in
     the ability of the fund to continue to make payments at book value").

28

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

market funds over the last six years is an improper hindsight-based challenge to the Plan fiduciaries' investment decision-making.  A fiduciary's actions are judged "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight," *St. Vincent*, 712 F.3d at 716, and in the period of recovery following the financial crisis, no reasonable fiduciary could have ruled out the possibility of an increase in interest rates to previous levels, a scenario that a money market fund would weather better than a stable value fund.  *See DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (ERISA "requires prudence, not prescience" (quotation omitted)); *Dudenhoeffer*, 134 S. Ct. at 2471–72 (ERISA does not fault fiduciaries for failing to outguess the market).

Fiduciary practice confirms what the foregoing makes obvious:  Plan fiduciaries do not uniformly embrace stable value funds as the only prudent low-risk investment vehicle, and plaintiffs' attempt to mandate them is thus without merit.  The Complaint itself cites a report by MetLife—a stable-value-fund provider—for the proposition that a majority of plans offer stable value funds.  But that report shows that, today, fully one-fifth of defined contribution plans do not offer any stable value option in their plan line-up at all, notwithstanding the recent history of low short-term interest rates.  Compl. ¶ 30 (citing MetLife Study); *see also* Vergara Decl., Ex. O (MetLife Study) at 5.  Moreover, the same study reflects that nearly ***two-thirds*** of plans (62%) offer a money market fund in their lineups, whether or not they also offer stable value.  According to plaintiffs' implausible *per se* imprudence theory, every one of those plans is open to litigation and judgment for fiduciary breach.  But that would cast the courts as investment advisors, an approach that has been roundly rejected.  *See Stewart v. Nat'l Shopmen Pension Fund*, 795 F.2d 1079, 1083 (D.C. Cir. 1986) ("Choices between reasonable alternatives . . . are for the trustees, not the courts."); *see also GMC v. Tracy*, 519 U.S. 278, 308 (1997) ("The Court is institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them.").  Plaintiffs' first count should accordingly be dismissed as a matter of law.

**C.      There Are No Facts That Support Plaintiffs' Allegation That The Plan Fiduciaries Were Imprudent In Their Selection Of The Plan's Remaining Investment Options.**

Plaintiffs allege in Count II that the Plan fiduciaries imprudently composed a Plan investment lineup that included options with unreasonable investment management fees. Plaintiffs offer three different theories to support this claim: (1) that the fiduciaries chose to offer some retail-class shares of mutual funds when cheaper institutional-class shares were available, Compl. ¶¶ 44–55; (2) that the fiduciaries selected a few non-Vanguard funds when they could have offered a cheaper, all-Vanguard lineup, *id.* ¶¶ 56–59; and (3) that the fiduciaries chose to offer some mutual funds when the Plan could have used only investments structured as separate accounts or collective trusts, *id.* ¶¶ 60–77.  None of these supports a claim of imprudence.

**1.      The Fiduciaries' Choice Of Retail-Class Mutual Funds Was Not An Abuse Of Their Discretion.**

Plaintiffs argue that the ESIP Investment Committee breached its fiduciary duties by "provid[ing] participants the more expensive share class" of some mutual funds.  Compl. ¶ 47. That theory rests on the flawed premise that the Committee both could have and should have moved into the institutional share classes of these funds.  Plaintiffs ignore that several courts, including the Ninth Circuit, have specifically "rejected the argument that a fiduciary should have offered only wholesale or institutional funds."  *Tibble I*, 729 F.3d at 1135 (quotations omitted); *see also Loomis*, 658 F.3d at 669–70 (granting a motion to dismiss a claim that fiduciaries should have offered institutional funds); *Hecker*, 556 F.3d at 586 (same); *Renfro*, 671 F.3d at 326–28 (dismissing claims that fiduciaries should have selected cheaper funds).  As the Seventh Circuit noted in *Hecker*, "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."  *Hecker*, 556 F.3d at 586; *see also Loomis*, 658 F.3d at 670 (same); *Tibble I*, 729 F.3d at 1135 (same).

By continuing to advance a defunct theory, plaintiffs also refuse to recognize the reasoning behind these holdings, *viz.*, that retail funds can have advantages over their institutional-class counterparts.  Retail funds are "offered to investors in the general public, and so the expense ratios necessarily [a]re set against the backdrop of market competition," which

1   benefits participants. *Loomis*, 658 F.3d at 670–71. They are more transparent and offer more

2   opportunities to benchmark. *Id.* at 672. And they are highly liquid, unlike "institutional

3   investment vehicles [which have] a drawback[ of] lower liquidity." *Id.* As the Ninth Circuit

4   explained in rejecting a near-identical attack against retail-class mutual funds, "[t]here are simply

5   too many relevant considerations for a fiduciary, for [any] type of bright-line approach [judging

6   the] prudence [of offering retail-class investments] to be tenable." *Tibble I*, 729 F.3d at 1135.

7           Here, the Plan fiduciaries' offering of some retail-class mutual funds is easily understood.

8   As the Complaint admits, Vanguard acted as the Plan's recordkeeper and, until March 31, 2012,

9   was compensated through revenue sharing out of the Plan's investment expenses. Compl. ¶ 86.

10  During that time, institutional clients whose accounts were recordkept by Vanguard were

11  generally not eligible for institutional-class shares. Vergara Decl., Ex. P (Vanguard Funds

12  Multiple Class Plan SEC Filing). And for good reason: Mutual fund complexes that also serve as

13  recordkeepers (such as Vanguard) commonly provide offsets to recordkeeping expenses that vary

14  based on the selected share class, as Vanguard's mutual fund prospectuses reflect.[8] Given these

15  circumstances, Plan officials had obvious reasons to select share classes with higher expense

16  ratios in some instances in order to ensure that the Plan's recordkeeping needs would be furnished

17  by Vanguard without any extra charges. Indeed, the Plan switched to less expensive share classes

18  once the Plan's recordkeeping-compensation arrangement with Vanguard changed from one

19  based on revenue sharing to one based on per-participant fees, reinforcing the inference that Plan

20  officials prudently considered this benefit in selecting retail funds. *See id.* at ¶ 47 (alleging that

21  the Plan switched to less expensive Vanguard share classes on April 1, 2012); ¶ 86 (alleging that

22  the Plan compensated Vanguard through revenue-sharing until March 31, 2012).

23          Other allegations in the Complaint confirm the absurdity of plaintiffs' claim that the Plan

24  fiduciaries imprudently failed to include cheaper institutional share classes. Plaintiffs concede

25

26  ───────────────
    [8] *Compare*, *e.g.*, Vergara Decl., Ex. Q (VBAIX Prospectus—Institutional Shares) at 28
27  ("Vanguard may charge additional recordkeeping fees for institutional clients whose accounts are
    recordkept by Vanguard"), *with* Vergara Decl., Ex. R (VBINX Prospectus—Individual Shares)
28  (making no similar statement regarding recordkeeping fees).

that several institutional class funds were included in the Plan lineup in 2010, *see*, *e.g.*, Compl.

¶ 47 (showing several institutional-class Vanguard funds in the Plan); *id.* ¶ 53 ("Chevron

provided the lowest-cost share class of the American Funds EuroPacific Growth Fund since

February 2010."), and that the fiduciaries continuously re-evaluated whether to switch to cheaper

institutional share classes, *see*, *e.g.*, *id.* ¶ 48 ("Chevron moved to lower-cost share classes for the

Vanguard mutual funds in 2012"),[9] or to eliminate higher-fee funds altogether, *see*, *e.g.*, *id.*

¶¶ 49–51.  Moreover, the breadth of investments and range of fees the Plan offered participants

fits well within the spectrum that courts have held reasonable as a matter of law.  *Compare*

Compl. ¶¶ 47–55 (alleging that the Plan's investment options charged fees ranging from .05% to

1.24%), *with*, *e.g.*, *Tibble I*, 729 F.3d at 1135 (affirming the reasonableness of fees that "varied

from .03[%] to 2%"); *Loomis*, 658 F.3d at 669–72 (affirming dismissal of an excessive-fee claim

where "expense ratios rang[ed] from 0.03% to 0.96%"); *Renfro*, 671 F.3d at 319, 326–28

(affirming dismissal of an excessive fee claim where fees "ranged from 0.1% to 1.21%"); *Hecker*,

556 F.3d at 586 (affirming dismissal of an excessive-fee claim where "[a]t the low end, the

expense ratio was .07%; at the high end, it was just over 1%").  Because plaintiffs allege nothing

that raises an inference that the Plan fiduciaries did anything other than provide an adequate mix

of investment options and expense ratios for participants, their retail-versus-institutional-share-

class claim must be dismissed.  *Iqbal*, 556 U.S. at 678; *see Renfro*, 671 F.3d at 326–28 (affirming

dismissal of a claim "directed exclusively to the fee structure" of a Plan).

> **2.  The Fiduciaries Did Not Abuse Their Discretion In Offering Non-Vanguard Funds To Complement The Lineup's Broad Array Of Vanguard Options.**

Plaintiffs' claim that the Plan should have offered only Vanguard options fares no better.

Plaintiffs argue that fees for certain investments were unreasonable because they were higher than

fees for comparable Vanguard options with the same general investment styles.  *See* Compl.

¶¶ 56–59.  Their insistence that fiduciaries are compelled to offer the cheapest option for a given

---

[9] *See also*, *e.g.*, Vergara Decl., Ex. F (2011 Form 5500) at 34 (reporting that, as of April 1, 2010, the ESIP Investment Committee switched the share classes for four Vanguard funds from retail to institutional).

1  particular investment strategy is, again, directly contrary to the many cases recognizing that

2  ERISA fiduciaries have latitude to value (and, indeed, must value) investment features other than

3  price—and dismissing claims like plaintiffs' accordingly.  *Hecker*, 556 F.3d at 586; *Loomis*, 658

4  F.3d at 670; *Renfro*, 671 F.3d at 326–28; *see also Tibble I*, 729 F.3d at 1135.

5         Plaintiffs' allegations regarding the Plan's failure to offer Vanguard products **exclusively**

6  is particularly absurd given that the use of a single investment manager is a frequent target of

7  ERISA complaints.  *See*, *e.g.*, *Hecker*, 556 F.3d at 586 (noting plaintiffs alleged that fiduciaries

8  "improperly limited the investment options to Fidelity mutual funds").  ERISA does not impose

9  such "heads I win, tails you lose" limitations on fiduciary decision-making.  *Bash v. Firstmark*

10  *Standard Life Ins. Co.*, 861 F.2d 159, 163 (7th Cir. 1988).  And it certainly does not require

11  fiduciaries to offer only Vanguard-managed funds.  *See Loomis*, 658 F.3d at 673 (fiduciaries

12  satisfied their duties by offering a mix of investment options and "le[aving the] choice [of

13  investments] to the people who have the most interest in the outcome").  Moreover, the

14  Complaint's allegations show that the Plan offered primarily Vanguard funds, *see* Compl. ¶ 47,

15  refuting any inference that the Investment Committee failed to weigh the costs and benefits of

16  offering the non-Vanguard funds it ultimately selected for the Plan rather than their Vanguard

17  equivalents.  Plaintiffs' complaint regarding the Plan's decision to offer investment products other

18  than Vanguard's fails as a matter of law.  *Iqbal*, 556 U.S. at 678.

19
              **3.      It Was Not Imprudent For The Plan Fiduciaries To Include Mutual**
20                      **Funds In The Plan Lineup.**

21         Plaintiffs' final theory under this count is perhaps the most trivial: Plaintiffs claim that the

22  Plan fiduciaries could only prudently select separate accounts and collective trusts for the Plan

23  lineup.  *See* Compl. ¶¶ 60–77.  This theory has been conclusively rejected by the Ninth Circuit

24  and other courts, again because it improperly assumes that fiduciaries must pursue the cheapest-

25  available investment option without regard for any other consideration.  *Tibble I*, 729 F.3d at

26  1135; *Hecker*, 556 F.3d at 586; *see also Loomis*, 658 F.3d at 670.  As these courts have

27  recognized, it is inappropriate to compare distinct investment vehicles by cost, since their

28  essential features differ so significantly.  *See Tibble I*, 729 F.3d at 1134 (rejecting an argument

that mutual funds are imprudent where collective trusts or separate accounts with the same investment strategy were available); *Loomis*, 658 F.3d at 671–72 (same).

As the Ninth Circuit recognized in *Tibble I*, mutual funds "have a variety of unique regulatory and transparency features" that make any attempt to compare them to institutional investment vehicles like collective trusts and separate accounts an "apples-to-oranges comparison." *Tibble I*, 729 F.3d at 1134.  Mutual funds' higher prices reflect the cost of complying with several "reporting, governance, and transparency requirements" that the Securities Act of 1933 and the Investment Company Act of 1940 impose on them, but not those other investment vehicles.  *Id.*  The additional cost of mutual funds thus comes with additional benefits, including a greater ability for plan participants to track fund performance in readily accessible materials like "newspaper[s] or internet sources," to conduct "mark-to-market benchmark[ing]" themselves, and to ensure that the fund's holdings are being properly valued. *Id.*; *see also Loomis*, 658 F.3d at 671–72 (same); *Renfro*, 671 F.3d at 318 (noting that mutual funds differ from other investment vehicles in that they are subject to several reporting, governance, and transparency requirements).

There is thus nothing inherently improper in the Plan fiduciaries' decision to offer mutual funds over other investment vehicles.  Nor do plaintiffs allege any facts supporting their conclusory suggestion that the fiduciaries failed to "adequately investigate . . . non-mutual fund alternatives."  Compl. ¶ 43.  To the contrary, the Complaint—which states that the Plan offered 16 mutual funds and 14 non-mutual fund alternatives—demonstrates that the fiduciaries considered ***and chose*** many non-mutual fund options, belying any inference that they had not considered these products' relative benefits.  Compl. ¶ 26.  As courts have recognized in dismissing similar claims, the duty of prudence simply requires a fiduciary to "offer participants meaningful choices about how to invest their retirement savings" and a "range of investment options and . . . characteristics of those included options—including the risk profiles, investment strategies, and associated fees."  *Renfro*, 671 F.3d at 327; *Loomis*, 658 F.3d at 673–74.  Here, the Complaint demonstrates that the Plan fiduciaries did just that.  *See* Compl. ¶ 26.  Plaintiffs' efforts to fault the Investment Committee for their correct consideration of a broad array of

1  investment factors beyond cost is thus legally deficient.

2

3      **D.    The Complaint Does Not Plausibly Allege Any Imprudence In The Plan's Revenue-Sharing Arrangement With Vanguard.**

4      In Count III, plaintiffs allege that, for approximately two years, the Plan paid an

5  unreasonable amount of recordkeeping fees to Vanguard for administrative services. *See* Compl.

6  ¶¶ 78–90. They make no allegations about the specific amount of fees the Plan paid during this

7  period, nor do they offer a benchmark to establish what amount of fees would be reasonable. *See*

8  *generally id.* Instead, their claim depends on three allegations: (1) from February 2010 to March

9  31, 2012, the ESIP Investment Committee compensated Vanguard for administrative services

10  exclusively through a share of the asset-based expenses charged for the Plan's investment options

11  (*i.e.*, through revenue sharing), rather than on a fixed per-participant basis, *id.* ¶¶ 80–82, 86;

12  (2) the assets in the Plan increased by 22% during this two-year period, leading to an

13  "unreasonable" increase in Vanguard's recordkeeping compensation, *id.* ¶ 86; and (3) the Plan

14  fiduciaries allegedly failed to solicit bids from alternative service-providers, *id.* ¶ 88. Each of

15  these theories fails as a matter of law.

16      To begin, ERISA does not condemn a fiduciary's use of a revenue-sharing arrangement to

17  cover recordkeeping costs. That principle is well-established in cases dismissing exactly that

18  claim. *Hecker*, 556 F.3d at 585 (holding that revenue sharing "violates no statute or regulation");

19  *Renfro*, 671 F.3d at 326–28 (rejecting a claim that "fees should be calculated on a per-participant

20  basis" because "services required to administer mutual funds do not vary based on the aggregate

21  amount of assets in the funds"). And the increase in Plan assets over this two-year period does

22  not support the inference, as plaintiffs claim, that Vanguard's revenue-sharing payments grew to

23  unreasonable levels. *See* Compl. ¶¶ 86–87. On the contrary, during the two years when

24  Vanguard received asset-based revenue-sharing payments for its services, the Plan switched to

25  cheaper share classes for at least four funds, ***decreasing*** the overall compensation Vanguard

26  obtained through its relationship with the Plan, and reducing the amount of revenue sharing

27  available to offset recordkeeping costs. Vergara Decl., Ex. F (2011 Form 5500) at 34.

28

1    Plaintiffs' final allegation relies on a misunderstanding of a fiduciary's prudential

2    obligations under ERISA.  Nothing in ERISA requires plan fiduciaries to obtain competitive bids

3    from recordkeeping service providers, *see* Compl. ¶ 88, and neither *George v. Kraft Foods*

4    *Global, Inc.*, 641 F.3d 786 (7th Cir. 2011), nor *Tussey v. ABB, Inc.*, 746 F.3d 327 (8th Cir. 2014),

5    creates such a requirement.  In *George*, the court held that a triable issue of fact existed regarding

6    the prudence of the plan fiduciaries' decision not to solicit competitive bids based on evidence

7    that had been adduced in that case.  *George*, 641 F.3d at 798.  *George*'s analysis has no

8    application here, where plaintiffs do not even allege that a competitive bid would have done the

9    Plan any good, because they do not allege any facts from which one could infer that the same

10   services were available for less on the market.  *See, e.g.*, *Young v. GM Inv. Mgmt. Corp.*, 325 F.

11   App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (holding that plaintiffs had not plausibly alleged that

12   the fiduciaries agreed to pay excessive fees where they "fail[ed] to allege that the fees were

13   excessive relative to the services rendered" (quotation omitted)).  The recordkeeping arrangement

14   was also fundamentally different here from that in *George*.  Most significantly, this Plan obtained

15   bundled investment-management and recordkeeping services from Vanguard until 2012,

16   generating savings that separately packaged services could not replicate.  The Complaint accepts

17   that Vanguard's fees have been reasonable since those services were unbundled in 2012, Compl.

18   ¶¶ 86–87, such that plaintiffs' competitive bidding charge makes no sense.  *Tussey*, 746 F.3d at

19   336 ("[B]undling services or revenue sharing, . . . are common and 'acceptable' investment

20   industry practices that frequently inure to the benefit of ERISA plans.").

21        *Tussey*, like *George*, also does not create any inference that the Investment Committee

22   acted imprudently in failing to solicit competitive bids.  In *Tussey*, the plaintiffs faulted the plan's

23   fiduciaries for allegedly failing to "adequately leverage the Plan's size to reduce fees" or to assess

24   whether its recordkeeper's "pricing was competitive," claims that were augmented by serious

25   disloyalty concerns—*i.e.*, that the outsized recordkeeping fees were subsidizing costs that would

26   otherwise have been the sponsor's own responsibility.  *Tussey*, 746 F.3d at 336.  Plaintiffs'

27   Complaint in this case and other judicially noticeable materials, by contrast, support only the

28   inference that the ESIP Investment Committee ***did*** consistently evaluate Vanguard's pricing and

20

1   *did* leverage the Plan's growth to reduce the fees the participants paid, as the Investment

2   Committee switched to lower-priced (and thus lower revenue-sharing) Vanguard share classes at

3   least once before March 31, 2012 and then to per-participant recordkeeping fees after that.

4   Compl. ¶ 86; Vergara Decl., Ex. F (2011 Form 5500) at 34.  Plaintiffs have thus failed to plead

5   facts that establish that the Investment Committee acted imprudently in setting and monitoring

6   Vanguard's recordkeeping fees.  *Iqbal*, 556 U.S. at 678.

7
        **E.     There Was No Abuse Of Discretion In The Timing Of The Removal Of The**
8       **Artisan Small Cap Value Fund.**

9            The Complaint's fourth count alleges that the Plan fiduciaries breached their duty of

10   prudence by failing to remove the Artisan Small Cap Value Fund (the "ARTVX Fund") as a Plan

11   option notwithstanding alleged "consistent and dramatic underperformance [of the fund]

12   compared to its benchmark, peer group, and similar lower-cost investment alternatives."  Compl.

13   ¶ 126.  The Complaint acknowledges that the ARTVX Fund was removed on April 1, 2014;

14   plaintiffs' theory is simply that it could have been removed earlier.  *Id.* ¶ 91.  This claim is a

15   meritless attempt to second-guess the Plan fiduciaries' "balancing of competing interests under

16   conditions of uncertainty."  *Armstrong*, 446 F.3d at 733.

17
            **1.     The Mere Fact That An Investment Has Performed Poorly Does Not**
18           **Support A Plausible Inference That The Fiduciaries Failed To**
            **Monitor The Investment.**

19            Plaintiffs' investment-performance challenge does not support an inference that the Plan

20   fiduciaries were imprudent in monitoring that performance.  Because plaintiffs do not plead any

21   facts directly addressing faults in the process of the plan fiduciaries, they must allege facts that

22   would permit the court to reasonably infer that there was a breach, which requires "more than the

23   *mere possibility* of misconduct."  *St. Vincent*, 712 F.3d at 718–19 (emphasis in original).

24   Plaintiffs cannot clear that hurdle by relying on the magnitude of a decrease in the investment's

25   price or by alleging that better opportunities were available.  *Id.*  Markets and investments are

26   both in a constant state of fluctuation.  A fiduciary may—and often does—retain investments

27   through a period of underperformance as part of a long-range investment strategy.  *See Jenkins v.*

28   *Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (defendant did not breach fiduciary duties by retaining

the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period, as it can be reasonable "to stay with . . . mutual funds even during years of lower performance").  Poor performance alone does not create a reasonable inference that the plan administrators failed to conduct an adequate investigation either when the investment was selected or as its underperformance emerged; ERISA instead requires a plaintiff to plead some other indicia of imprudence.  *St. Vincent*, 712 F.3d at 718–19; *see also DeBruyne*, 920 F.2d at 465 ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money; such a pronouncement would convert the Balanced Fund into an account with a guaranteed return and would immunize plaintiffs from assuming any of the risk of loss associated with their investment."); *Rinehart v. Lehman Bros. Holdings Inc.*, No. 15-2229, 2016 U.S. App. LEXIS 5114, at *16 (2d Cir. Mar. 18, 2016) (upholding dismissal where pleading did not explain in a non-conclusory fashion how an investigation would have uncovered information that would have showed the investment to be imprudent).

Here, plaintiffs do not allege that the fiduciaries ignored a manager change, or a change in investment philosophy, or some other signal of a problem requiring attention.  *Cf.* Vergara Decl., Ex. J (IPS) at 7 (directing attention to qualitative factors including "fundamental changes in a fund manager's investment philosophy, organizational structure (e.g., manager tenure), and financial condition (including any significant changes in total assets under management)").  They do not identify any specific monitoring steps that were not followed.  Plaintiffs' challenge to the ARTVX Fund rests exclusively on its performance leading up to its removal from the Plan lineup. Plaintiffs assert that, by the time it was removed on April 1, 2014, the Fund had significantly underperformed its alleged benchmark and other available funds and performed poorly in the Morningstar category rankings in three out of the four previous years.  *See* Compl. ¶¶ 93–94.  Just as in *St. Vincent*, those allegations do not suggest a process failure.  Indeed, the fact that the Plan fiduciaries ***did*** ultimately remove the Fund supports the opposite inference—that they were monitoring the Fund and removed it when they determined it was not, at that time, a suitable option for the Plan.  *Cf. In re Lehman Bros. Securities & ERISA Litigation*, 113 F. Supp. 3d 745, 757–58 (S.D.N.Y. 2015) (duty to monitor claim insufficient because it was "pure speculation to

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1    say that a meeting or other review by the Plan Committee would or should have resulted in the

2    slightest change of course or otherwise prevented the consequences" of the failure to remove the

3    investment option from the plan).

4         Plaintiffs allege that Plan participants would have done better in either of two alternative

5    investments offered by Vanguard that outperformed the ARTVX Fund during the relevant period.

6    *See id.* ¶¶ 94–95.  That hindsight critique proves nothing.  ERISA judges fiduciary decision-

7    making *as of the time the decisions were made*.  29 U.S.C. § 1104(a)(1)(B) (fiduciary must act

8    "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

9    prudent man acting in a like capacity and familiar with such matters would use in the conduct of

10   an enterprise of a like character and with like aims"); *see DeBruyne*, 920 F.2d at 465 (allegation

11   that a fund lost money when it did not "follow[] the crowd" does not show a breach of the duty,

12   which requires only "prudence, not prescience").  Plaintiffs do not (and could not) allege anything

13   suggesting that the Plan fiduciaries could predict that the ARTVX Fund would underperform

14   plaintiffs' preferred alternatives during these years.

15            **2.    Plaintiffs' Allegations Respecting The Fund's Performance Before
                       2014 Are Contrary To Judicially Noticeable Facts.**
16

17        Plaintiffs allege that the fund should have been removed "well before 2014" based on its

18   alleged sustained poor performance, but plaintiffs' allegations of poor performance are defective.

19   They purport to show the ARTVX Fund's underperformance with a comparison to the Fund's

20   alleged benchmark in the one-, three-, and five-year periods leading up to *September 30, 2014*,

21   Compl. ¶ 97—that is, by including a six-month period of poor performance *after* the Fund was

22   removed from the Plan lineup.  But that comparison says nothing about the information the Plan

23   fiduciaries had at hand when deciding whether to remove the Fund in the period before April 1,

24   2014, when it was dropped from the lineup.[10]  *See St. Vincent*, 712 F.3d at 716 ("we judge a

25   fiduciary's actions based upon information available to the fiduciary at the time of each

26   investment decision and not from the vantage point of hindsight" (citations omitted)).

27   _____

28   [10] Plaintiffs' use of the 2014 Morningstar category rankings is unilluminating for similar reasons.

23

1    Moreover, judicially noticeable performance data shows that the Fund did not consistently

2    underperform its benchmark before it was removed, but rather outperformed it on a long-term

3    trailing basis.  Vergara Decl., Ex. S (Fund Morningstar Performance Charts).  The fiduciaries'

4    choice not to remove the Fund based on short-term underperformance was entirely consistent

5    with a focus on long-term performance—a rational philosophy for retirement plans, which,

6    plaintiffs concede, have "longer investment horizons."  Compl. ¶ 28.  Judicially noticeable data

7    likewise establish that even in the third quarter of 2014 (after the Plan exited the Fund), $300-plus

8    million was still invested in institutional-class shares of the Fund (*i.e.*, shares held exclusively by

9    large retirement plans), and that the largest exodus of assets from the Fund occurred between then

10   and late 2015—meaning the Plan fiduciaries exited the investment at the vanguard of other

11   market actors.  Vergara Decl., Ex. T (Artisan Partners Funds 2016 Prospectus) at 109.  These data

12   suggest prescient fiduciary decision-making, not fiduciary inattention.

13   **F.      Plaintiffs' Monitoring Claim Fails.**

14   Plaintiffs' final count alleges that Chevron breached its fiduciary duties by failing to

15   monitor appointees to whom it delegated fiduciary responsibility.  Compl. ¶¶ 131–33.  This

16   derivative claim falls apart with plaintiffs' failure to plausibly allege any underlying breach by the

17   appointed fiduciaries, and must be dismissed.  *See*, *e.g.*, *Rinehart v. Akers*, 722 F.3d 137, 154 (2d

18   Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor by the Director

19   Defendants absent an underlying breach of the duties imposed under ERISA by the Benefit

20   Committee Defendants."), *vac'd on other grounds*, 134 S. Ct. 2900 (2014), *and reaffirmed by*

21   *Rinehart v. Lehman Bros. Holdings Inc.*, No. 15-2229, 2016 U.S. App. LEXIS 5114, at *17 (2d

22   Cir. Mar. 18, 2016); *In re HP ERISA Litig.*, 58 Employee Benefits Cas. (BNA) 1297, at *27 (N.D.

23   Cal. 2014) (dismissing derivative claims of failure to monitor and participation in co-fiduciaries'

24   alleged breaches, along with underlying claims); *Romero*, 2013 WL 5692324, at *5 (dismissing

25   derivative failure to monitor claim).

26   Count V would also have to be dismissed even if any of plaintiffs' other claims survived.

27   A monitoring claim requires a threshold showing that the monitoring fiduciary failed to "review

28   the performance of its appointees at reasonable intervals in such a manner as may be reasonably

24

1   expected to ensure compliance with the terms of the plan and statutory standards." *See*, *e.g.*, *In re*

2   *Calpine Corp.*, No. C-03-1685-SBA, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) (claim

3   dismissed in the absence of such allegations); *see also* 29 C.F.R. § 2509.75-8, FR-17.  Plaintiffs

4   allege nothing of the kind here.  Indeed, they do not allege any facts at all about the monitoring

5   process, or how it was supposedly deficient.  In the face of this gap, the Court cannot plausibly

6   infer that Chevron failed to properly discharge its duty to monitor any fiduciary delegates.

7   **V.     CONCLUSION**

8          Plaintiffs' claims cannot be sustained as a matter of law, as their own factual allegations

9   show.  Plaintiffs do little more than second-guess the Plan fiduciaries' considered judgments

10  regarding Plan investment options and fees, without offering any facts to support their

11  contentions that the fiduciaries acted disloyally and imprudently in managing the ESIP.  Indeed,

12  the facts alleged in the Complaint prove the opposite:  They show that the Plan fiduciaries offered

13  a diversified group of investment options, made changes to the Plan line-up as needed, and took

14  care to manage Plan-related fees, both by making adjustments to the Plan's arrangement with

15  Vanguard atibblend by moving funds to institutional-class shares whenever appropriate.  Given

16  these facts, it is no wonder plaintiffs' Complaint is short on specifics and replete with boilerplate

17  language borrowed from their counsel's standard pleading.  Their stock claims cannot be squared

18  with the reality of how the ESIP was managed—and, as pleaded, they do not state viable claims.

19  Defendants thus respectfully request that the Court dismiss plaintiffs' claims in their entirety with

20  prejudice.

21          Dated:  April 18, 2016                    M. RANDALL OPPENHEIMER
                                                        BRIAN D. BOYLE
22                                                      CATALINA J. VERGARA
                                                        O'MELVENY & MYERS LLP
23
                                                        By: /s/ *Catalina J. Vergara*
24                                                          Catalina J. Vergara

25                                                      Attorneys for Defendants
                                                        CHEVRON CORPORATION and
26                                                      CHEVRON CORPORATION ESIP
                                                        INVESTMENT COMMITTEE
27

28

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH