1  M. RANDALL OPPENHEIMER (S.B. #77649)
   roppenheimer@omm.com
2  CATALINA J. VERGARA (S.B. #223775)
   cvergara@omm.com
3  O'MELVENY & MYERS LLP
   400 S. Hope Street
4  Los Angeles, CA 90071-2899
   Telephone:    (213) 430-6000
5  Facsimile:    (213) 430-6407

6  BRIAN D. BOYLE (S.B. #126576)
   bboyle@omm.com
7  O'MELVENY & MYERS LLP
   1625 Eye Street, NW
8  Washington, DC  20006
   Telephone:    (202) 383-5300
9  Facsimile:    (202) 383-5414

10 Attorneys for Defendants
   CHEVRON CORPORATION and
11 ESIP INVESTMENT COMMITTEE

12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                   OAKLAND DIVISION

16

17 CHARLES E. WHITE, JR., *et al.*,        Case No.  4:16-cv-00793-PJH

18            Plaintiffs,               **DEFENDANTS' NOTICE OF MOTION
                                        AND MOTION TO DISMISS**
19     v.                               **PLAINTIFFS' AMENDED COMPLAINT;
                                        MEMORANDUM OF POINTS &**
20 CHEVRON CORPORATION, *et al.*,        **AUTHORITIES IN SUPPORT THEREOF**

21            Defendants.               Date:          January 18, 2017
                                        Time:          9:00 a.m.
22                                      Judge:         Hon. Phyllis J. Hamilton
                                        Courtroom:     3, Third Floor
23
                                        Compl. Filed:   February 17, 2016
24                                      Am. Compl. Filed: September 30, 2016

25                                      Trial Date:     None set

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**NOTICE OF MOTION**</u>

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on January 18, 2017, at 9:00 a.m. or on the date and time ordered by the Court, in Courtroom 3 at the United States Courthouse, 1301 Clay Street, Oakland, California 94612, 3rd Floor, the Honorable Phyllis J. Hamilton presiding, Defendants Chevron Corporation and the ESIP Investment Committee will and hereby do move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the First, Second, Third, Fourth, Fifth, and Sixth Counts of the Amended Complaint filed by Plaintiffs Charles E. White, Jr., John P. Jacobs, Verlan D. Hoopes, Nora L. Pennington, James A. Ray, and Jeannette A. Finley, individually and as representatives of a class of participants and beneficiaries in the Chevron Employee Savings Investment Plan.

Defendants bring this motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that plaintiffs fail to allege sufficient facts to support their claims for breach of defendants' fiduciary duties.  This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed Declaration of Catalina J. Vergara and Request for Judicial Notice, the pleadings in this action, and such other materials and evidence as may be presented to the Court.

Dated: October 28, 2016

M. RANDALL OPPENHEIMER
BRIAN D. BOYLE
CATALINA J. VERGARA
O'MELVENY & MYERS LLP


By: */s/ Catalina J. Vergara*
      Catalina J. Vergara

Attorneys for Defendants
CHEVRON CORPORATION and
ESIP INVESTMENT COMMITTEE

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND ISSUES TO BE DECIDED ........................................................ 1

II. STATEMENT OF RELEVANT FACTS ........................................................................ 3

III. LEGAL STANDARD ................................................................................................... 4

IV. ARGUMENT ............................................................................................................... 5

    A.    Plaintiffs' Rehashed Allegations Regarding The Money Market Fund Do Not State A Legally Cognizable Claim .................................................................. 5

    B.    Plaintiffs Fail To State A Viable Claim That Defendants Breached Their Duty Of Prudence By Allegedly Causing Plan Participants To Incur Unreasonable Investment Management Fees .......................................................... 8

    C.    Plaintiffs' Claim That The Plan Fiduciaries Breached Their Duty Of Prudence By Paying Excessive Recordkeeping Compensation To Vanguard Fails As A Matter Of Law .................................................................................. 10

        1.    Plaintiffs' Allegations Regarding The Recordkeeping Fees Allegedly Paid By The Plan In 2010 And 2011 Do Not Support An Inference Of Imprudence. ...................................................... 11

        2.    Plaintiffs' Allegations Regarding A "Conflict Of Interest" Are Pure Fiction, And Do Not Support An Inference Of Disloyalty. ..................... 15

        3.    Plaintiffs' Claim Is Barred By ERISA's Three-Year Statute Of Limitations. ............................................................................................ 18

    D.    Plaintiffs' New Prohibited Transactions Claim Must Be Dismissed. .................. 19

    E.    Plaintiffs Again Fail To State Any Claim That The Plan Fiduciaries Were Imprudent In Retaining The Artisan Small Cap Value Fund ............................... 20

    F.    Plaintiffs' Unrevised Duty To Monitor Claim Remains Both Derivative And Flawed. ..................................................................................................... 21

V.  CONCLUSION .......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. LaSalle Bank Nat'l Ass'n*,
  446 F.3d 728 (7th Cir. 2006) ................................................................................. 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 4, 5

*Boorstein v. Men's Journal LLC*,
  No. CV 12-771 DSF (Ex), 2012 WL 3791701 (C.D. Cal. Aug. 17, 2012) ................. 9

*Chao v. Merino*,
  452 F.3d 174 (2d Cir. 2006) ................................................................................. 8

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ............................................................................. 19

*DeBruyne v. Equitable Life Assurance Soc'y*,
  920 F.2d 457 (7th Cir. 1990) ............................................................................. 21

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S. Ct. 2459 (2014) ....................................................................................... 4

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999) ......................................................................................... 18

*Jablon v. Dean Witter & Co.*,
  614 F.2d 677 (9th Cir. 1980) ............................................................................. 19

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006) ............................................................................. 21

*Knight v. Standard Ins. Co.*,
  No. Civ. 07-1691 WBS EFB, 2008 WL 343852 (E.D. Cal. Feb. 6, 2008) ................. 8

*Landwehr v. DuPree*,
  72 F.3d 726 (9th Cir. 1995) .............................................................................. 18

*Morse v. Stanley*,
  732 F.2d 1139 (2d Cir. 1984) ........................................................................... 18

*Pegram v. Herdich*,
  530 U.S. 211 (2000) ........................................................................................... 5

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) ............................................................................. 21

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011)....................................................................................... 15

*Romero v. Nokia*,
  No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ........................... 4

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001), *opinion amended on
  denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001)........................................... 11, 12, 13

*Tibble v. Edison Int'l* ("*Tibble I*"),
  729 F.3d 1110 (9th Cir. 2013)................................................................................ 4, 14

*Tibble v. Edison Int'l* ("*Tibble II*"),
  135 S. Ct. 1823 (2015)............................................................................................. 4, 5

*Yamauchi v. Cotterman*,
  84 F. Supp. 3d 993 (N.D. Cal. 2015) ........................................................................ 18

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)...................................................................................... 4

**Statutes**

ERISA § 404(a), 29 U.S.C. § 1104(a) ............................................................................ 5

ERISA § 408, 29 U.S.C. § 1108 .................................................................................... 19

ERISA § 413, 29 U.S.C. § 1113 .............................................................................. 18, 19

**Other Authorities**

DOL Adv. Op. No. 13-03A, *available at* https://www.dol.gov/agencies/
  ebsa/employers-and-advisers/guidance/advisory-opinions/2013-03a ....................... 13

Gov't Accountability Office, 401(k) Plans: Certain Investment Options and
  Practices that May Restrict Withdrawals Not Widely Understood,
  Report to the Chairman, Special Committee on Aging,
  U.S. Senate (Mar. 2011), *available at* http://www.gao.gov/new.items/d11291.pdf.............. 6, 7

In Re Proxy Voting by Inv. Advisors, SEC Release No. 2106,
  2003 WL 215467 (Jan. 31, 2003) ............................................................................. 16

Mutual Fund Directory 2016,
  *available at* http://mutualfunddirectory.org/ (last visited Oct. 26, 2016) ................... 17

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3

Stephen D. Fisher, *RICs and the Retail Investor: A Marriage
of Convenience or Necessity?*, 66 TAX LAW 331 (2013) ............................................................ 7

4

**Regulations**

5

17 C.F.R. § 270.2a-7 (2012) ............................................................................................................ 7

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION AND ISSUES TO BE DECIDED**

Plaintiffs' Amended Complaint does nothing to salvage their deficient claims.  They reassert the same claims of disloyalty, imprudence, and failure to monitor against the fiduciaries of the Chevron Employee Savings Investment Plan (the "Plan") but still fail, as a matter of law, to articulate cognizable breaches of any fiduciary duties.  Although they have added pages and paragraphs to their original pleading, none of the amendments is materially different from their original, insufficient allegations, and none cures the deficiencies that this Court already found required dismissal of all of the counts in their original Complaint.  Plaintiffs' claims should again be dismissed—this time, with prejudice.

On their imprudence claims, plaintiffs continue to assert that the Plan fiduciaries were categorically precluded from offering a money market fund to Plan participants instead of the stable value fund alternative plaintiffs prefer—but they are still wrong that ERISA forbids a fiduciary to employ a money market fund as the safe, capital preservation option in a plan lineup, as this court previously found.  (Aug. 29, 2016 Order ("Order") at 13:20–22 ("Offering a money market fund as one of an array of mainstream investment options along the risk/reward spectrum more than satisfied the Plan fiduciaries' duty of prudence.").)  Moreover, they again "plead no facts showing that the Plan fiduciaries failed to evaluate . . . the relative risks and benefits of money market funds vs. other capital preservation options."  (*Id.* at 14:11–14.)

Plaintiffs' challenges to the expenses of certain mutual funds in the Plan's lineup, and to the use of revenue sharing to compensate Vanguard for its recordkeeping services from 2010 to 2012, likewise remain unavailing.  They cannot state a claim by pointing to the availability of cheaper investment options in the marketplace, particularly when the fiduciaries continually made less expensive options available.  As the Court found, it is "inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly."  (*Id.* at 21:28–22:1.)  Nor can plaintiffs state a claim by alleging a "fail[ure] to monitor and control the amount of asset-based revenue sharing fees Vanguard received" that is based on nothing more than their say-so (Dkt. 41 ("Am. Compl."), ¶ 125), particularly when the fiduciaries'

renegotiation of a cheaper arrangement suggests just the opposite.  "Revenue sharing is a common and acceptable investment industry practice that frequently inure[s] to the benefit of ERISA plans," and there is no prohibition against it.  (Order at 25:21–23 (internal citations and quotation marks omitted).)

Finally, plaintiffs' renewed challenge to the fiduciaries' decision not to remove the Artisan Small Cap Value Fund from the Plan lineup before April 1, 2014 still fails, because the claim depends—as it did in the original Complaint—on a hindsight assessment of the Fund's performance, not on the information available to Plan fiduciaries at the time.  Despite the Court's specific guidance, plaintiffs still "have not alleged any facts sufficient to suggest that the Plan fiduciaries could predict that the ARTVX Fund would underperform plaintiffs' preferred alternatives during the period from February 2010 until April 1, 2014, when the Fund was removed from the lineup."  (*Id.* at 32:14–17.)

The defect common to plaintiffs' imprudence challenges is the same as before: plaintiffs allege nothing to support a plausible inference that the Plan fiduciaries' process for selecting, monitoring, and removing Plan options was flawed in any way.  There has to be "more than a sheer 'possibility'" that the Plan fiduciaries violated their fiduciary duties (*id.* at 14:18–23 (citation omitted)), and plaintiffs' Amended Complaint still does nothing to move their claims across that line.  Their attempt to improve their pleading by littering the Amended Complaint with conclusory allegations about the Plan fiduciaries' alleged failure to "employ appropriate methods" does not do the trick.  (*E.g.*, Am. Compl., ¶¶ 45, 46, 70, 154.)  The Court should once again hold that plaintiffs have failed to state any viable imprudence claims.

With respect to plaintiffs' disloyalty claims, the Amended Complaint includes one last-ditch improvisation: plaintiffs now assert that the Plan fiduciaries had a "conflict," although the nature of that conflict is unclear.  Plaintiffs assert that Vanguard's proxy voting guidelines were pro-management, and that Vanguard provided recordkeeping services to several non-qualified

Chevron plans[1] at an unspecified "discount," but there is nothing about these facts that amounts to an actual conflict—much less one that could support a disloyalty claim.  Indeed, plaintiffs nowhere allege any *quid pro quo*, and they do not expressly allege that Plan participants could have paid lower fees absent the alleged "conflict."  In any event, any "conflict" premised on what plaintiffs imply (but never allege)—collusion between Chevron and Vanguard—is undermined by the Amended Complaint itself, which acknowledges that the Plan fiduciaries took affirmative actions to continually reduce Vanguard's fees over time by moving to lower-cost share classes and renegotiating the recordkeeping arrangement.  Plaintiffs' conclusory allegations "on information and belief" were tellingly absent from the original Complaint, and have been added here to manufacture a claim of disloyalty that does not exist.  They do not even cross into the realm of possible, let alone plausible.

Plaintiffs will no doubt urge—as their counsel have in other similar cases—that the sheer number of paragraphs in their Amended Complaint justifies denial of this motion.  But it is the substance of those allegations that matters—and here, plaintiffs still do not allege facts to support their claims that the Plan fiduciaries made decisions for the Plan either imprudently or disloyally.  On the contrary, and as before, the Amended Complaint tells a different story:  that in "switch[ing] to cheaper share classes for at least four funds" (Order at 26:2–9), "renegotiate[ing] the[] recordkeeping arrangement with Vanguard to limit compensation," (*id*. at 27:9–11), and "actively monitoring" and "remov[ing] an underperforming fund (*id*. at 31:13–16), among other things, the fiduciaries managed the Plan attentively and with the participants' best interests in mind.  The Amended Complaint should be dismissed with prejudice.

## II.     STATEMENT OF RELEVANT FACTS

The facts relevant to this motion are described in detail in defendants' first motion to dismiss (Dkt. 27) and the Court's August 29, 2016 Order granting the motion (Dkt. 40).  So as to

---

[1]  A non-qualified plan is a tax-deferred, employer-sponsored retirement plan that falls outside of ERISA, like a deferred compensation plan or an executive bonus plan.

1    not burden the Court with another recitation of those facts, defendants incorporate Section II of

2    their first motion to dismiss by reference into this brief.  (Dkt. 27 at 4–6.)

3    **III.    LEGAL STANDARD**

4          On a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), while the

5    court is to accept as true all of the factual allegations in the complaint, legally conclusory

6    statements that are not supported by actual facts need not be accepted.  *Ashcroft v. Iqbal*, 556 U.S.

7    662, 678–79 (2009).  "[W]here the well-pleaded facts do not permit the court to infer more than

8    the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the

9    pleader is entitled to relief.'"  *Id.* at 679.  If granting a plaintiff leave to amend would be futile, a

10   court may order dismissal with prejudice.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981,

11   1007 (9th Cir. 2009) (explaining that the district court's discretion to dismiss with prejudice is

12   particularly broad where the plaintiff was previously granted leave to amend and subsequently

13   failed to add the requisite particularity); *see also Romero v. Nokia*, No. C 12-6260 PJH, 2013 WL

14   5692324, at *5 (N.D. Cal. Oct. 15, 2013) ("Because the court finds that the defects of the

15   complaint cannot be cured by amendment, the dismissal is with prejudice.").

16         The Supreme Court regards dismissal motions as an "important mechanism for weeding

17   out meritless claims" in an ERISA action.  *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459,

18   2471 (2014).  A claim of fiduciary imprudence requires a plaintiff to allege facts showing that the

19   fiduciary did not act "with the care, skill, prudence, and diligence that a prudent person acting in a

20   like capacity and familiar with such matters would use."  *Tibble v. Edison Int'l* ("*Tibble II*"), 135

21   S. Ct. 1823, 1828 (2015) (quotations omitted).  The exercise of fiduciary discretion is reviewed

22   "deferentially" for an "abuse of discretion," *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d

23   728, 733 (7th Cir. 2006), in light of "the circumstances . . . prevailing at the time the fiduciary

24   act[ed]," *Dudenhoeffer*, 134 S. Ct. at 2471 (citation and quotations omitted).  A fiduciary's

25   prudence is judged by process, not outcome.  *Tibble v. Edison Int'l* ("*Tibble I*"), 729 F.3d 1110,

26   1136 (9th Cir. 2013) ("the primary question is whether the fiduciaries, at the time they engaged in

27   the challenged transactions, employed the appropriate methods to investigate the merits of the

28

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1    investment and to structure the investment"), *vacated on other grounds*, *Tibble II*, 135 S. Ct. 1823

2    (2015).

3        ERISA § 404(a)(1) also imposes a duty of loyalty on plan fiduciaries: "a fiduciary shall

4    discharge his duties with respect to a plan solely in the interest of the participants and

5    beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and

6    beneficiaries; and . . . defraying reasonable expenses of administering the plan."  29 U.S.C.

7    § 1104(a)(1)(A).  This duty focuses on the fiduciaries' motivation and "requires that plan

8    fiduciaries make decisions 'with an eye single to the interests of the participants and fiduciaries.'"

9    (Order at 7:6–8 (quoting *Pegram v. Herdich*, 530 U.S. 211, 235 (2000).)  To survive dismissal, a

10   claim for disloyalty must allege *facts* plausibly suggesting an improper motive, rather than an

11   "obvious alternative explanation" for the conduct.  *Iqbal*, 556 U.S. at 682.

12   **IV.    ARGUMENT**

13       **A.    Plaintiffs' Rehashed Allegations Regarding The Money Market Fund Do Not
             State A Legally Cognizable Claim.**
14

15       Plaintiffs' amended allegations regarding Count I—defendants' purported breach of their

16   fiduciary duties for failure to offer a stable value fund in lieu of the Plan's Vanguard Prime

17   Money Market Mutual Fund—offer little more than bold, italicized font on top of allegations that

18   this Court has already held fail to state a claim.  Plaintiffs still summarily claim that defendants

19   "fail[ed] and refus[ed] to employ appropriate methods" to assess the comparative merits of money

20   market and stable value funds (Am. Compl., ¶ 154), but they offer no facts in support of that

21   theory.

22       Instead, plaintiffs amended Count I by adding more of the same allegations previously

23   found to be insufficient—primarily allegations emphasizing that money market funds have

24   yielded lower returns than stable value funds over the purported class period.  (*Compare* Am.

25   Compl., ¶¶ 42–45, 54–60, 65, 69b–d, *with* Dkt. 1 ("Compl."), ¶ 36 (alleging underperformance

26   over the past 10, 15 and 20 years).)  Those allegations do nothing to transform their conclusory,

27

28

hindsight-based critique of the performance of money market funds that the Court has already found do not state a claim.[2]  They further continue to miss the point that a fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment subsequently proves to be lower yielding, and the mere selection of that alternative in no way suggests a failure to approach that decision thoughtfully.  As this Court held, "[o]ffering a money market fund as one of an array of mainstream investment options along the risk/reward spectrum more than satisfied the Plan fiduciaries' duty of prudence" (Order at 13:20–22), and focusing on relative underperformance "over the last six years is an improper hindsight-based challenge to the Plan fiduciaries' investment decision-making" (*id*. at 14:24–15:2).  No fiduciary selecting a plan's safe option can foresee whether the risks associated with stable value investing will come to fruition, and a fiduciary may reasonably choose to avert those risks in favor of a safer alternative.

Indeed, plaintiffs' new allegations rely on materials that reinforce this point.  The 2011 GAO Report cited in the Amended Complaint—which notes that half of all 401(k) plans do not offer stable value funds—highlights the significant risks and liquidity limitations associated with stable value investments.[3]  For example, the report notes that stable value funds "typically require certain restrictions on plan sponsor and participant withdrawals or transfers of plan assets from stable value funds," limiting the freedom of participants to move their money into and out of the plan's "safe" option as they please.  (Vergara Decl., Ex. A, GAO Report at 17.)  The GAO Report also cites several examples of 401(k) Plans that faced multi-year lock-up periods because of events like company mergers, layoffs, and bankruptcies.  (*See id*. at 24.)  And it notes that certain employer-initiated events can result in the loss of principal protection under the insurance "wrap" contracts covering the stable value fund.  (*Id*. at 26.)  Further, if a large number of participants

---

[2] Defendants addressed the flaws with these arguments in their initial motion to dismiss, and incorporate those arguments here by reference.  (*See* Dkt. 27 at 8–13.)

[3] *See* Gov't Accountability Office, 401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood, Report to the Chairman, Special Committee on Aging, U.S. Senate (Mar. 2011), *available at* http://www.gao.gov/new.items/d11291.pdf.

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

pursue withdrawals when the market value of the stable value fund is under book value, the participants remaining in the fund will face sustained periods of low crediting rates—and may risk losses if the insurers providing "wrap" coverage become insolvent.  (*Id*.)  The numerous risks of investing in stable value funds are detailed in the GAO Report (*id*. at 28), belying plaintiffs' conclusory assertions that stable value funds are an obvious no-added-risk alternative to money market funds.

Plaintiffs' cited materials also undercut their contention that stable value funds and money market funds will always have a large performance gap.  For example, they refer to a 2016 Vanguard newsletter, "Money Market Reform and Stable Value: Considerations for Plan Fiduciaries" (Am. Compl., ¶ 61 n.31)—yet that same newsletter states, "[a]lthough the performance gap between stable value and money market funds may make stable value appear attractive today, that gap may narrow in the future as interest rates are expected to increase from their historically low levels."  (Vergara Decl., Ex. B, Vanguard Newsletter at 8.)[4]  Similarly, plaintiffs cite a July 2012 article by Karin LaBarge, "Stable Value Funds: Considerations for Plan Sponsors" (Am. Compl., ¶¶ 65, 69d)—yet ignore the portion stating that, "should interest rates rise sharply, money market funds' yields might be higher, over the short term, than those of stable value funds."  (Vergara Decl., Ex. C, LaBarge Article at 5.)  And, while the Amended Complaint refers pejoratively to the availability of money market funds to retail investors (*see, e.g.*, Am. Compl., ¶ 41), this highlights another risk of stable value funds—they aren't subject to the SEC regulations governing money market mutual funds because the SEC has, since 2004, refused to allow stable value products to be offered to the general investing public in mutual funds.[5]

---

[4] The newsletter also explains, as the Department of Labor has recognized, that "[a]s with all investing, there is no 'free lunch' in pursuit of higher returns.  There are trade-offs between offering stable value in a [Defined Contribution] plan versus investing in a less restrictive and more liquid money market fund or other fixed income alternatives."  (*Id*. at 6.)

[5] *See* Stephen D. Fisher, *RICs and the Retail Investor: A Marriage of Convenience or Necessity?*, 66 TAX LAW 331, 390 (2013) ("A stable-value fund is similar to a money market fund in the sense that it maintains a stable net asset value.  Unlike a money market fund, a stable-value fund is not subject to strict limits in Rule 2a-7 under the 1940 Act on the types of assets in which it invests. 17 C.F.R. § 270.2a-7 (2012).  At one time, the SEC permitted stable-value funds to be structured as mutual funds (i.e., 1940-Act-registered vehicles that were taxable as RICs), but it eliminated this practice around 2004.").

Finally, plaintiffs allege that the $875 million invested in the money market fund as of December 31, 2010 shows that defendants knew participants were using it "as a long-term investment vehicle," and that defendants thus must have failed to conduct a prudent process for evaluating the fund.  (Am. Compl., ¶ 69a.)  But the judicially noticeable 2010 Form 5500 for the Plan shows that the $878 million invested in the money market fund was only slightly more than 5% of the $15+ billion in total investments held by the Plan at the end of 2010.  (*See* Vergara Decl., Ex. D, at 38); *see also Knight v. Standard Ins. Co.*, No. Civ. 07-1691WBS EFB, 2008 WL 343852, at *2 (E.D. Cal. Feb. 6, 2008) (taking judicial notice of Form 5500).)  Plaintiffs do not explain how participants' collective allocation of just 5% of the Plan's assets to the Plan's safe money market fund option somehow proves that participants were using the Fund as a "long-term investment" vehicle; if anything, only the contrary inference is supportable.  But even if plaintiffs could offer the missing explanation, there still would be no support for the further inference that a small allocation to a low-risk option on a long-term basis within a diversified portfolio is in any way imprudent.  *See Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (noting that prudence does not require a fiduciary to take "any particular course of action if another approach seems preferable") (quotation omitted).  Count I accordingly should be dismissed as a matter of law.

**B.**     **Plaintiffs Fail To State A Viable Claim That Defendants Breached Their Duty Of Prudence By Allegedly Causing Plan Participants To Incur Unreasonable Investment Management Fees.**

As in the original Complaint, Count II of the Amended Complaint encompasses three distinct theories regarding why the Plan's investment management fees were unreasonable. Plaintiffs allege: (i) that the fiduciaries imprudently selected mutual fund share classes with higher expense ratios than other available share classes in the same funds (Am. Compl., ¶¶ 71–89); (ii) that the fiduciaries imprudently offered non-Vanguard mutual fund options, when they could have selected comparable Vanguard funds at lower expense (*id.*, ¶¶ 90–92); and (iii) that the fiduciaries imprudently offered mutual funds when the Plan could have used less expensive institutional products, such as collective trusts or separate accounts (*id.*, ¶¶ 93–110).

Although plaintiffs were given an opportunity to plead additional facts in support of this claim, they instead decided to stand on their initial, deficient allegations.  Apart from two

editorial alterations and changes to paragraph numbering, plaintiffs' allegations regarding the fiduciaries' offering of non-Vanguard mutual funds and failure to offer institutional products are identical to the implausible allegations contained in the original Complaint.  (*Compare* Compl., ¶¶ 56–59, *with* Am. Compl., ¶¶ 90–92 *and* Compl., ¶¶ 60–77 *with* Am. Compl., ¶¶ 93–110.) While plaintiffs are free to stand on their allegations, their decision to do so here, and attendant failure to address the deficiencies identified by the Court, doom these theories for purposes of this motion.  *See*, *e.g.*, *Boorstein v. Men's Journal LLC*, No. CV 12-771 DSF (Ex), 2012 WL 3791701, at *1 (C.D. Cal. Aug. 17, 2012) (dismissing second amended complaint with prejudice, noting "[t]he SAC is virtually identical to the First Amended Complaint (FAC), and it appears that Plaintiff does not even attempt to cure the defects identified in the Court's Order dismissing the FAC").

Plaintiffs continue to argue that the Plan fiduciaries acted imprudently by failing to choose the lowest share class for certain mutual funds or by not choosing cheaper, non-Vanguard funds (Am. Compl., ¶¶ 71–78, 90–92), and they attempt to augment this theory by arguing that certain of the higher-cost funds also did not offset recordkeeping or administrative costs (Am. Compl., ¶ 81).  But these new allegations add nothing, because plaintiffs still fail to recognize that price is but one investment feature that fiduciaries are required to consider and weigh in making investment decisions.  As the Court correctly noted in its Order dismissing plaintiffs' claims, fiduciaries "have latitude to value investment features other than price (and indeed, are required to do so)."  (Order at 18:25–28.)

Thus, while plaintiffs continue to allege that "Chevron selected high-priced share classes of mutual funds despite the availability of lower-cost share classes of those mutual funds" (Am. Compl., ¶ 76), and that alternative structures, such as separate accounts, may also have reduced fees (Am. Compl., ¶¶ 93–96), it is irrelevant that other funds might offer lower expense ratios in situations such as this, where a plan offers "a diversified array of investment options" (Order at 18:28–19:4).  As the Court noted, it is not enough to point out that the Plan included "a fund with an expense ratio that is higher than that of the lowest share class," because "[t]his claim, standing alone, is insufficient to state a claim that fiduciaries imprudently failed to consider lower cost

1   options." (*Id.* at 20:2–7.) Nonetheless, plaintiffs continue to hang their claim solely on the fact

2   that the Plan fiduciaries did not offer the lowest expense ratios for certain funds. Indeed, the only

3   new allegations pled in the Amended Complaint on this claim relate to the alleged impropriety of

4   not choosing the least expensive share classes for investment options. (*See* Am. Compl., ¶¶ 77–

5   78, 81, 87–88.) Such allegations are insufficient to state an imprudence claim for the reasons

6   already stated in the Court's Order. (*See* Order at 19:5–20:22.)

7          As the Court further observed in the Order, "[c]ourts have dismissed claims that

8   fiduciaries are required to offer institutional-class funds over retail-class funds, and claims that

9   fiduciaries were imprudent in failing to offer cheaper funds." (*Id.* at 19:5–7.) It is not enough for

10  plaintiffs to speculate that the Plan fiduciaries "could have" offered lower-cost funds or non-

11  Vanguard options, or to compare distinct investment vehicles with different characteristics solely

12  by cost. (*Id.* at 21:24–22:4.) Plaintiffs must plead facts supporting an inference that the

13  Investment Committee failed to weigh the costs and benefits of offering the retail-share classes,

14  non-Vanguard funds, or mutual funds rather than other investment vehicles. As with the original

15  Complaint, plaintiffs have failed to do so, and the Court should once again dismiss Count II.

16         **C.     Plaintiffs' Claim That The Plan Fiduciaries Breached Their Duty Of
                    Prudence By Paying Excessive Recordkeeping Compensation To Vanguard**
17                  **Fails As A Matter Of Law.**

18         Count III of the Amended Complaint re-alleges that the Plan paid an unreasonable amount

19  of fees to Vanguard for administrative services between February 2010 and March 2012. As in

20  the initial Complaint, plaintiffs focus on Vanguard's receipt of recordkeeping compensation via

21  revenue sharing from the Plan's mutual fund investments. (*See* Am. Compl., ¶¶ 111–29.)

22  Plaintiffs try to rush past the fact that *nothing* in ERISA prohibits such revenue sharing

23  arrangements (*id.*, ¶ 117), yet they continue to assert hollow allegations that the Plan fiduciaries

24  acted imprudently by compensating Vanguard for administrative services exclusively through

25  revenue sharing, rather than on a fixed per-participant basis, particularly as Plan assets grew. (*Id.*,

26  ¶¶ 111–15, 125.) They also repeat the assertion that Plan fiduciaries improperly failed to solicit

27  bids from other recordkeepers on a regular basis. (*Id.*, ¶¶ 120, 126.)

28

As the Court noted when dismissing plaintiffs' original Complaint, these allegations fail. (*See generally* Order at 22–27.)  Plaintiffs' allegations still support no inference that the Plan's fiduciaries acted imprudently in monitoring fees as Plan assets grew—and, as this Court has already held, any such inference would conflict with: (1) plaintiffs' admissions that the Plan fiduciaries renegotiated the recordkeeping arrangement with Vanguard four years ago, entering into the kind of flat-fee arrangement that plaintiffs' claim should have been the agreement all along; and (2) judicially noticeable Plan filings showing that defendants moved to less expensive share classes of at least four funds even during the 2010–2011 period, prior to the renegotiation. (*Id.* at 26:2–9.)  Similarly, plaintiffs' allegations suggesting there was a requirement to solicit competitive bids has "no legal foundation."  (*Id.* at 26:10–11.)  At their core, plaintiffs' allegations remain nothing more than a "conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable" (*id.* at 25:19–21), which cannot sustain plaintiffs' imprudence claim.

In an attempt to bolster these conclusory assertions, plaintiffs add new allegations related to the fees allegedly paid under the revenue-sharing arrangement and a supposed "conflict" that plaintiffs contend clouded the Plan fiduciaries' oversight of recordkeeping fees.  (*See generally* Am. Compl., ¶¶ 118–24.)  These allegations do nothing to save plaintiffs' claim—which, in any event, is barred by ERISA's three-year statute of limitations.

### 1. Plaintiffs' Allegations Regarding The Recordkeeping Fees Allegedly Paid By The Plan In 2010 And 2011 Do Not Support An Inference Of Imprudence.

Plaintiffs first attempt to revive their recordkeeping claim by offering a guess as to the per-participant dollar amount for the Plan's recordkeeping arrangement with Vanguard for 2011 and 2012, in the hope that this guess will show imprudence.  (Am. Compl., ¶¶ 120–22.)  The Court should not view plaintiffs' guess as a well-pleaded factual assertion, when it is undermined by readily available and judicially noticeable public filings, materials referenced in the Amended Complaint, and even other allegations within the Amended Complaint.  *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.  Nor is the

1  court required to accept as true allegations that are merely conclusory, unwarranted deductions of

2  fact, or unreasonable inferences.") (citations omitted), *opinion amended on denial of reh'g*, 275

3  F.3d 1187 (9th Cir. 2001).

4        Specifically, plaintiffs allege that the recordkeeping fees were $167 to $181 in 2010 and

5  2011, and that those figures are the sum of: (1) the direct compensation to Vanguard reported on

6  the Plan's Form 5500s; and (2) purported revenue sharing levels from the funds, expressed in

7  basis points.  (Am. Compl., ¶ 122.)  But their calculations are so deeply flawed that they need not

8  be credited by the Court.  First, plaintiffs' reliance on the Form 5500s for direct compensation

9  data is flawed, because the "direct compensation" reported there includes fees for services other

10  than recordkeeping.  Schedule C to the Plan's Form 5500s discloses direct Plan compensation to

11  Vanguard (and other third parties)—*e.g.*, the Form 5500 for 2011 discloses $2,158,730 in direct

12  compensation to Vanguard that year.  (Vergara Decl., Ex. E, at 6.)  But the Service Codes on that

13  same Schedule C show that this compensation was not only for recordkeeping (Code 15), but also

14  for directed trustee services (Code 25), participant-level investment advisory services (Code 26),

15  securities brokerage services (Code 33), participant loan processing (Code 37), and investment

16  management fees paid indirectly by the Plan (Code 52).  (*Id.*; *see also* Vergara Decl., Ex. L, 2011

17  Form 5500 Instructions at 28.)  Plaintiffs lump all of these fees together and label them

18  "recordkeeping" fees, even though most have nothing to do with recordkeeping.

19        Second, plaintiffs' "internal revenue sharing" numbers are similarly made up.  They allege

20  that "Vanguard received 10 bps of internal revenue sharing on the retail (Investor) share class

21  Vanguard mutual funds" (Am. Compl., ¶ 120), and that "the estimated revenue sharing or indirect

22  compensation Vanguard received from its proprietary Investor share mutual fund options" (Am.

23  Compl., ¶ 122) informs their calculation.  The judicially noticeable Summary Prospectuses for the

24  retail mutual funds offered by the Plan before 2012 delineate fund fees, but break them down into

25  "Management Expenses" and "Other Expenses."  (*E.g.*, Vergara Decl., Ex. I, VWNFX 2011

26  Summary Prospectus at 3 (stating "Total Annual Fund Operating Expenses" are 35 basis points,

27  comprising 33 basis points of "Management Expenses" and 2 basis points of "Other Expenses").)

28  Nowhere are "internal revenue sharing" expenses listed or broken out, and nowhere do plaintiffs

provide the source of these numbers.[6]  Indeed, the "12b-1 Distribution Fee"—a common designation for one type of revenue sharing[7]—is *zero* in the Summary Prospectus.  (*Id.*)  This makes clear that, had Chevron obtained an alternative recordkeeper through an RFP, it would have paid the exact same expense ratios for the Vanguard funds in the lineup, and no revenue from the investment options would have been available to defray recordkeeping expenses.

Moreover, the Plan's Form 5500s show that the Plan offered the Institutional share class of the Vanguard Balanced Index in 2010 and 2011, at *zero* basis points, rather than the Investor share class plaintiffs wrongly allege was offered, at plaintiffs' estimate of 10 basis points. Plaintiffs thus presumably included 10 basis points for that fund (instead of zero) in calculating revenue sharing.  (Vergara Decl., Exs. D, 2010 Form 5500 at 34; E, 2011 Form 5500 at 35.)  It is perhaps no surprise that, within two paragraphs of guessing the range of recordkeeping fees, plaintiffs allege that revenue sharing arrangements are "exceedingly opaque"—thus conceding that their estimates lack foundation.  (*See* Am. Compl., ¶ 124.)[8]  These flawed allegations need not be accepted by the Court.  *See Sprewell*, 266 F.3d at 988 (court need not accept as true allegations that are conclusory, unwarranted deductions of fact).

Moreover, plaintiffs' cherry-picking of recordkeeping fees for two specific years fails to support an inference that the Plan fiduciaries acted imprudently.  There are no facts pled in the

---

[6] Nor is there any suggestion that Vanguard does not use all of the "Management Expense" for investment management and related investment expenses.  Indeed, retail buyers of the Investor class shares also would have paid the same "Management Expenses" and "Other Expenses," even when not investing through a 401(k) plan using Vanguard for recordkeeping, further undermining plaintiffs' assertion that 10 basis points of the retail funds' expenses were necessarily available to defray the Plan's recordkeeping costs rather than being used exclusively for investment management.

[7] *See, e.g.*, DOL Adv. Op. No. 13-03A ("Principal receives revenue sharing payments from these investments in the form of Securities and Exchange Commission Rule 12b-1fees, shareholder and administrative services fees or similar payments."), *available at* https://www.dol.gov/agencies/ ebsa/employers-and-advisers/guidance/advisory-opinions/2013-03a.

[8] At the hearing on Defendants' Motion to Dismiss the original Complaint, plaintiffs' counsel twice agreed they don't know the amounts paid to Vanguard for recordkeeping services in 2010 and 2011 (Hearing Tr. 32:20-22; 38:8 "we don't have access" to the revenue paid to Vanguard), further demonstrating that plaintiffs' new allegations were crafted *ex nihilo*.

1   Amended Complaint from which the Court could plausibly infer that the *overall compensation*

2   paid to Vanguard for recordkeeping services over the term of the agreement—inclusive of prior

3   periods when Plan assets were considerably lower[9]—was excessive.  Even assuming that the

4   Plan's asset-based fee arrangement resulted in higher recordkeeping fees in 2010 and 2011, at

5   least when measured on per-participant, dollar basis, this ignores that asset-based fee

6   arrangements will naturally fluctuate as asset levels rise and fall.  And there are a number of

7   reasons why a prudent fiduciary might prefer an asset-based fee arrangement—and no doubt why

8   such arrangements are not prohibited under ERISA.  Among other advantages, asset-based fees

9   shift risk from participants to the recordkeeper, who must still provide the same services in a year

10  when a down market means lower fees.  Such fees are also advantageous to participants with

11  lower balances—likely to be lower-paid, younger (with longer investment horizons), newer to

12  Plan, or all of the above.  Even in plaintiffs' estimation, four of the largest and most popular

13  investment options have no revenue sharing component, allowing participants the flexibility to

14  reduce or eliminate their contributions for revenue sharing.  (*See* Am. Compl., ¶ 81.)

15          Like other allegations in the Amended Complaint, plaintiffs' recordkeeping fee allegations

16  function only in hindsight.  Even accepting as true the allegation that the Plan's 2010 and 2011

17  asset-based fees for Vanguard's recordkeeping services were higher than fixed per-participant

18  recordkeeping rates available in the market for the same package of services, this does not

19  support the inference that Plan fiduciaries must have known the Plan's assets would increase

20

21  [9] Elsewhere, the Amended Complaint concedes that recordkeeper compensation fluctuates with
    the movement of investment values.  (*See* Am. Compl., ¶ 117 (observing that fee payments under
22  revenue-sharing plan increase as value of plan assets increases).)  Indeed, the Plan's assets were
    sharply lower in 2008 and 2009 (i.e., during the financial crisis), meaning that compensation paid
23  to Vanguard for its recordkeeping services over that two year period was significantly lower.
    (Vergara Decl., Ex. F, 2007 Form 5500, Schedule H, Line 13 at p. 12; Ex. G, 2008 Form 5500,
24  Schedule H, Line 13 at p. 11; Ex. H, 2009 Form 5500, Schedule H, Line 13 at p. 11 (the Plan's
    interest in mutual funds declined from $6.5 billion at the end of 2007 to $4.1 billion at the
25  beginning of 2009).)  The severe decline in assets in 2007 through 2009 undermines plaintiffs'
    assertion that asset based recordkeeping fees were imprudent "at the time [the fiduciaries]
26  engaged in the challenged transaction," *Tibble I*, 729 F.3d at 1136.  The Plan's fiduciaries would
    have been well-aware of the recent, severe decline in asset values when they were deciding what
27  type of fee arrangement to maintain for the Plan in 2010 and 2011.

28

1    substantially in 2010 and 2011, and the fees (when converted from asset-based percentages to

2    dollars per participant) along with them.  There is even less support for the inference that the Plan

3    fiduciaries therefore followed an improper process when continuing the asset-based fee

4    arrangement with Vanguard in 2010 and 2011.  In fact, the Third Circuit in *Renfro* upheld

5    dismissal when faced with allegations very similar to those raised by these plaintiffs in the

6    Amended Complaint.  *Renfro v. Unisys Corp.*, 671 F.3d 314, 326–28 (3d Cir. 2011); *see also*

7    Appellants' Br. at 48, Civ. App. No. 10-2447 (Sept. 9, 2010) (arguing that it "is evident that

8    FMTC's revenue sharing was excessive . . . [because] [t]he $5,700,000 revenue sharing payment

9    to FMTC was equal to $190 per participant for the 30,000 participants in that year.").

10         Finally, and as previously noted, plaintiffs' own allegations reveal that the Plan fiduciaries

11   were monitoring recordkeeping fees and reduced those fees during the period in question by

12   moving to lower fee share classes and renegotiating recordkeeping fees effective March 31, 2012.

13   (Am. Compl., ¶¶ 79, 125) (*see also*  Order at 26:2–9 (finding that these changes plausibly suggest

14   that defendants were monitoring recordkeeping fees).)  As plaintiffs argued at the hearing on

15   defendants' motion to dismiss the original Complaint, their complaint is that "the arrangement

16   [defendants] were able to negotiate in 2012 should have been done a lot sooner."  (Hearing Tr. at

17   34:1-2.)  But plaintiffs again fail to answer the question posed by the Court:  exactly when such a

18   renegotiation should have occurred, in order to escape plaintiffs' accusation of imprudence.  (*Id.*

19   at 34:15-18.)

20              **2.     *Plaintiffs' Allegations Regarding A "Conflict Of Interest" Are Pure***
                 ***Fiction, And Do Not Support An Inference Of Disloyalty.***
21

22         In a further attempt to prop up their recordkeeping claim, plaintiffs allege two theories of

23   disloyalty, neither of which was alleged in the original Complaint (even though they are based on

24   information that was available to plaintiffs at the time) and neither of which is supported by any

25   facts.  The first of these theories refers to Vanguard's proxy voting standards, which are alleged

26   to be pro-management.  (Am. Compl., ¶¶ 29–40.)  The second refers to the fact that Vanguard

27

28

                                                     15                    DEFS.' MOT. TO DISMISS
                                                                           CASE NO. 4:16-CV-00793-PJH

provided services to seven, smaller, non-qualified plans for Chevron.[10]  (*Id.* at ¶¶ 127–29.)
Nowhere do plaintiffs have the conviction to explicitly allege why these allegations matter.  But
even if plaintiffs were to connect the dots (which they do not do) and allege that Vanguard's
proxy voting standards or its arrangement with the non-qualified plans somehow influenced
Chevron to retain Vanguard or to inflate the Plan's recordkeeping fees, their theories of "conflict"
would still be fundamentally inconsistent with the facts alleged in their own Amended
Complaint—facts that show that, despite any purported "conflict," Chevron repeatedly took
actions to *reduce* Vanguard's fees over the class period.  (*See*, *e.g.*, Am. Compl., ¶ 80 (moving to
lower-cost share class), ¶ 123 (recordkeeping fee of $23/participant as of January 1, 2015).)

On the first theory, plaintiffs allege nothing to suggest the Plan fiduciaries were aware of
Vanguard's allegedly pro-management voting position, or that it influenced Chevron's retention
of Vanguard in any way.  Vanguard—lauded as the gold standard by plaintiffs' counsel in other
cases—is a significant shareholder in every public company; its outsized role in index fund
investing makes it a significant shareholder of virtually all publicly traded companies.  There is
no allegation that Vanguard did anything unique with respect to Chevron—to the contrary, the
Amended Complaint alleges that Vanguard took pro-management positions for all companies
across the S&P 500, and as a block, across all of its funds, regardless of whether it provided
retirement services to such companies.  (Am. Compl., ¶¶ 32–33.)  To suggest this uniform policy
was conceived of to maximize recordkeeping fees from the few companies to which Vanguard
provides retirement services is absurd on its face.  Vanguard has $3 trillion in assets under
management (Am. Compl., ¶ 32) and votes its shares on behalf of, and in the interest of, its
mutual fund clients.[11]  It is incredible to think that Vanguard would be motivated to chase a few

---

[10] Plaintiffs allege that Vanguard could have hired a "pure recordkeeper" to provide
recordkeeping services to the Plan, in light of its supposed conflict (Am. Compl., ¶ 128), but that
is false.  Because the Plan contracted with Vanguard to provide those services, Vanguard had no
authority to subcontract that task out to another entity without Chevron's permission.  Further,
plaintiffs cannot seriously contend that adding yet another vendor—in addition to Vanguard—
would reduce costs to Plan participants.

[11] In voting the proxies, Vanguard must comply with the duties of care and loyalty it owes its
clients.  *See In Re Proxy Voting by Inv. Advisors*, SEC Release No. 2106, 2003 WL 215467, at

1    million dollars in recordkeeping fees, putting $3 trillion in assets at risk in the process.  Nor is

2    there a remotely plausible allegation of a *quid pro quo* here.  Vanguard's proxy voting policies

3    apply regardless of whether they provide recordkeeping services for the companies in which they

4    invest on behalf of their customers.

5           It is also implausible that Chevron would retain Vanguard as part of a scheme to benefit

6    its own management—especially given that Vanguard, as an institution, holds only 6.62% of

7    Chevron's total shares.  (*See* Vergara Decl., Ex. J, Morningstar, Chevron Equity Ownership:

8    Institutions at 2.)  Many of the top fund complexes have proxy voting guidelines similar to

9    Vanguard's.  The fact that the three mutual fund companies that plaintiffs identified as voting

10   against management are 15th (AXA), 22nd (RBC) and 68th (BMO) (Am. Compl., ¶ 37)  on the list

11   of top mutual fund companies, ranked by AUM, illustrates that Vanguard's voting policies are

12   typical in this respect.[12]  Under plaintiffs' theory, Chevron would apparently be conflicted from

13   retaining any recordkeepers that are active in the mutual fund or asset management business and

14   that vote in favor of management proposals.  This would actively *harm* Plan participants, by

15   prohibiting well-known, well-respected recordkeepers (like Vanguard) from administering the

16   Plan.  Notably, plaintiffs nowhere allege that a hypothetical "unconflicted" recordkeeper—

17   whoever that may be—could have provided the same quality of services at a lower fee.

18          Second, plaintiffs allege "on information and belief" that Vanguard provided discounted

19   services to seven non-qualified Chevron plans—but plaintiffs fail to offer any details to transform

20   this thin allegation into a breach of fiduciary duty.  The Amended Complaint does not allege that

21   Chevron sought any discount on the additional plans, nor even the nature of the discount—*e.g.*,

22   what rates the non-qualified plans pay, what the market rate should have been—let alone any *quid*

23   *pro quo*.  The sum of the allegations is that Vanguard was able to offer lower-cost services to

24

25   *2 (Jan. 31, 2003) ("Under the Advisers Act, however, an adviser is a fiduciary that owes each of

26   its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting.").

27   [12] *See* Mutual Fund Directory | 2016, *available at* http://mutualfunddirectory.org/ (last visited Oct. 26, 2016).

28

1    Chevron for its corporate plans because of the scale of the overall recordkeeping relationship.

2    (Am. Compl., ¶ 127).  Even assuming this were true, it would not amount to disloyalty.  As courts

3    have recognized, the mere fact of an incidental benefit to an employer or fiduciary does not itself

4    establish disloyalty.  *See, e.g.*, *Morse v. Stanley*, 732 F.2d 1139, 1146 (2d Cir. 1984) ("It is no

5    violation of a trustee's fiduciary duties to take a course of action which reasonably best promotes

6    the interest of plan participants simply because it incidentally also benefits the corporation."); *see*

7    *also Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 445–46 (1999) ("ERISA, by and large, is

8    concerned with ensuring that employees will not be left emptyhanded once employers have

9    guaranteed them certain benefits, not with depriving employers of benefits incidental thereto.")

10   (quotation and citation omitted).  Here, plaintiffs do not allege that, had Chevron paid non-

11   discounted fees on the corporate plans, it would have been offered lower fees on the employee

12   Plan.  The only reasonable inference is that Chevron adeptly negotiated lower fees from an

13   already low fee provider on behalf of all of its retirement plans recordkept by Vanguard.

14              **3.       Plaintiffs' Claim Is Barred By ERISA's Three-Year Statute Of**
                           **Limitations.**
15

16              Even if plaintiffs' recordkeeping claim were viable—and it is not, for the reasons

17   described above—it would still fail as a matter of law, because it is time-barred.  "A plaintiff fails

18   to state a claim, and therefore dismissal is appropriate, where his failure to comply with the

19   applicable statute of limitations is evident from the allegations of the complaint."  *Yamauchi v.*

20   *Cotterman*, 84 F. Supp. 3d 993, 1004–05 (N.D. Cal. 2015) (dismissing ERISA breach of fiduciary

21   claim on statute of limitations grounds) (citations omitted).  "As a general rule, ERISA's statute

22   of limitations requires that an action be filed no more than 'three years after the earliest date on

23   which the Plaintiff had actual knowledge of the breach or violation.'"  *Landwehr v. DuPree*, 72

24   F.3d 726, 731 (9th Cir. 1995) (citing 29 U.S.C. § 1113).  Here, the Amended Complaint only

25   challenges the reasonableness of administrative fees charged prior to March 31, 2012 (i.e., when

26   Vanguard was compensated through a revenue-sharing arrangement) and only includes

27   allegations regarding the fees allegedly paid in 2010 and 2011.  (*See* Am. Compl., ¶¶ 120–22,

28   124.)  At the very latest, plaintiffs were aware of the allegedly excessive recordkeeping fee

1    arrangement in February 2012, when they received a detailed disclosure from Chevron regarding

2    the transition from a revenue-sharing fee agreement for Vanguard's recordkeeping services to a

3    flat fee arrangement.  (*See* Vergara Decl., Ex. K, 2012 Newsletter at 4.)  That disclosure outlines

4    that many administrative fees were previously covered by higher expenses on certain mutual

5    funds in the Plan and that a quarterly administrative fee would replace the prior structure.  (*Id.*)  It

6    also listed the precise before and after fees of every investment affected by the change.  (*Id.* at 6–

7    8.)  Because plaintiffs had actual knowledge of their claim over three years before they

8    commenced this action, Court III is untimely and fails as a matter of law.

9    **D.    Plaintiffs' New Prohibited Transactions Claim Must Be Dismissed.**

10   Plaintiffs also assert a new claim in the Amended Complaint: Count IV, alleging that

11   retaining Vanguard—the recordkeeper that plaintiffs' counsel have, for years, criticized other

12   defendants for not retaining (*see* Dkt. 27 at 4 n.2)—was a prohibited transaction.  This new claim

13   is as hollow as the others.  Not only does ERISA create an exemption from prohibited

14   transactions by explicitly permitting a plan to "contract[] or mak[e] reasonable arrangements with

15   a party in interest for . . . services necessary for the establishment or operation of the plan, if no

16   more than reasonable compensation is paid therefor," 29 U.S.C. § 1108, but plaintiffs' new

17   prohibited transaction claim is also barred by ERISA's statute of repose, 29 U.S.C. § 1113.

18   A claim is properly dismissed under Rule 12(b)(6) if it is clear from the complaint that the

19   claim is barred by the relevant statute of limitations or repose.  *Jablon v. Dean Witter & Co.*, 614

20   F.2d 677, 682 (9th Cir. 1980) ("If the running of the statute is apparent on the face of the

21   complaint, the defense may be raised by a motion to dismiss.").  ERISA provides for a six-year

22   statute of repose; specifically, ERISA § 413(a), 29 U.S.C. § 1113(a), states that "[n]o action may

23   be commenced . . . six years after (A) the date of the last action which constituted a part of the

24   breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could

25   have cured the breach or violation."  *See also David v. Alphin*, 704 F.3d 327, 339 (4th Cir. 2013)

26   ("Because § 413's limitations period begins immediately upon the last action which constituted a

27   part of the breach or violation, § 413 can most accurately be described as a statute of repose.

28   Accordingly, the limitations period begins running when a specific event occurs, regardless of

DEFS.' MOT. TO DISMISS
CASE NO. 4:16-CV-00793-PJH

1  whether a cause of action has accrued or whether any injury has resulted." (quotations and

2  citations omitted)).  Here, plaintiffs are explicit about the transaction they purport to be

3  prohibited: it is "causing the Plan to engage Vanguard to be the Plan's recordkeeper."  (Am.

4  Compl., ¶¶ 166–67.)  The Complaint also explicitly alleges that "Chevron selected Vanguard as

5  the Plan's recordkeeper" in 2002—fourteen years ago.  (Am. Compl., ¶ 28.)  The decision to

6  retain Vanguard very clearly occurred well before the six-year statute of repose, and is thus time-

7  barred.

8         **E.    Plaintiffs Again Fail To State Any Claim That The Plan Fiduciaries Were
              Imprudent In Retaining The Artisan Small Cap Value Fund.**
9

10        Plaintiffs add nothing of consequence to their failed claim regarding the Artisan Small

11  Cap Value Fund (the "ARTVX Fund")—the Amended Complaint merely doubles down on their

12  previously-rejected, underperformance-in-hindsight theories.  The Court has already found that

13  plaintiffs' own allegations create a plausible inference that the Plan fiduciaries were attentively

14  monitoring the ARTVX Fund, in that they removed it from the Plan lineup in April 2014, while it

15  was still outperforming its benchmark on a long-term trailing basis.  (Order at 31:12–16.)  The

16  Court also explained that poor fund performance alone is not enough to create a reasonable

17  inference that plan administrators failed to monitor the fund.  (*Id*. at 31:20–23.)

18        Yet plaintiffs still, and only with the benefit of hindsight, insist that the fund's allegedly

19  "dismal" performance is enough to state a claim.[13]  (Am. Compl., ¶ 134 ("[b]ased on this

20  performance history, a prudent fiduciary would have removed the [ARTVX Fund]").)  It is not.

21  _____

22  [13] The Amended Complaint contains additional information on the ARTVX Fund's performance
    relative to its Morningstar category and its peer group on a quarterly basis and in terms of its

23  one-, three-, and five-year return periods.  This is just more of the same.  Not only do more
    allegations of poor performance fail to move the ball towards a plausible claim of fiduciary

24  breach, as the Court recognized in dismissing the count in the original Complaint, but the
    additional detail in fact evidences the cloudy and inconsistent picture of performance that was

25  available at the time to the Plan fiduciaries monitoring the fund.  As alleged, even with the benefit
    of hindsight, the fund's relative performance was mixed in the years leading up to its removal.  It

26  was not until the first quarter of 2013—only a year before the fund was removed—that it ranked
    in the bottom quartile based on the five-year total return period.  (Am. Compl. ¶ 133.)  And only

27  in 2012 did the fund dip below the median in the three-year return period without recovering.
    (*Id*.)

28

The common practice of retaining investments through periods of under-performance as part of a long-range investment strategy is plainly permitted.  (Order at 31:24–32:1 (citing *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006)).)  Plaintiffs' hindsight judgments of the Plan fiduciaries' monitoring process, including allegations regarding alternative investments that would have made more money than the ARTVX Fund, are thus insufficient to state a claim. (Order at 32:5–17.)

To state a viable claim, plaintiffs must "plead some other objective indicia of imprudence."  (*Id.* at 31:20–24 (citing *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013); *DeBruyne v. Equitable Life Assurance Soc'y*, 920 F.2d 457, 465 (7th Cir. 1990)).)  Plaintiffs attempt to meet this requirement by adding a new allegation that retaining the ARTVX Fund "drove revenue to Vanguard" and that removing the fund would have "eliminated a steady stream of . . . revenue sharing payments to Vanguard."  (Am. Compl., ¶¶ 130, 139.)  Once again, it's unclear what plaintiffs are attempting to say, beyond the fact that mutual funds charge fees.  Plaintiffs do not allege that defendants' retention of the ARTVX Fund, despite its poor performance, was driven by a desire to provide fees to Vanguard, but they presumably want the Court to draw that conclusion.  In any event, that notion is contradicted by plaintiffs' own acknowledgement that Chevron switched to a fixed recordkeeping fee arrangement in 2012, well before the fund's removal in April 2014.  (*See, e.g.*, *id.*, ¶ 125.)  The suggestion that the Plan fiduciaries retained the Fund after March 31, 2013 (when plaintiffs allege the Fund became "clearly" imprudent) to drive revenue sharing compensation to Vanguard—*after* Chevron and Vanguard discontinued their revenue sharing arrangement—is as implausible as it sounds.  Because plaintiffs fail to allege any additional facts supporting their claim of fiduciary breach related to the removal of the ARTVX Fund, the Court should again dismiss Count V.

### F.      Plaintiffs' Unrevised Duty To Monitor Claim Remains Both Derivative And Flawed.

Plaintiffs' duty to monitor claim remains unchanged in the Amended Complaint.  They still allege that Chevron breached its fiduciary duties "[t]o the extent that" it delegated those duties to other, unspecified fiduciaries.  (Am. Compl., ¶ 176.)  The Court found these allegations

lacking in its previous ruling, in part on the ground that the claim that Chevron had a duty to monitor "to the extent that" its duties were delegated suggested that plaintiffs did not know whether Chevron had such a duty.  (Order at 33:19–22.)  Moreover, plaintiffs did not specify whom Chevron allegedly failed to monitor, and didn't allege any facts about how the monitoring process was deficient.  (*Id*. at 34:7–8.)  These same deficiencies doom Count VI of the Amended Complaint.

**V.      CONCLUSION**

For the reasons stated above, plaintiffs' Amended Complaint should be dismissed with prejudice.

Dated: October 28, 2016

M. RANDALL OPPENHEIMER
BRIAN D. BOYLE
CATALINA J. VERGARA
O'MELVENY & MYERS LLP

By: */s/ Catalina J. Vergara*
          Catalina J. Vergara

Attorneys for Defendants
CHEVRON CORPORATION and
ESIP INVESTMENT COMMITTEE