UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CHARLES E. WHITE, et al.,

        Plaintiffs,

        v.

CHEVRON CORPORATION, et al.,

        Defendants.

Case No.  16-cv-0793-PJH

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**

       Defendants' motion to dismiss the first amended complaint came on for hearing before this court on January 18, 2017.  Plaintiffs appeared by their counsel Jamie L. Dupree, James Redd, and Heather Lea, and defendants appeared by their counsel Catalina J. Vergara.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

## INTRODUCTION

       This is a case brought as a proposed class action, under ERISA § 502(a)(2), (3), 29 U.S.C. § 1132(a)(2), (3), alleging breach of fiduciary duty.  Plaintiffs filed the complaint on February 17, 2016.  On August 29, 2016, the court granted defendants' motion to dismiss the complaint for failure to state a claim, with leave to amend.  Plaintiffs filed the first amended complaint ("FAC") on September 30, 2016.

       Plaintiffs are participants in the Chevron Employee Savings Investment Plan ("the Plan" or "the ESIP Plan") – a § 401(k) defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).[1]  FAC ¶¶ 1-3, 8-9, 13-

---

[1]  A "defined contribution plan" is a plan in which "employees and employers may contribute to the plan, and the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide."  <u>Hughes Aircraft Co. v. Jacobson</u>, 525 U.S. 432, 439 (1999), <u>quoted in</u> <u>Anderson v. DHL Ret.</u>

18, 25.  As of December 31, 2014, the Plan had over $19 billion in total assets and more than 40,000 participants with account balances.  FAC ¶ 12.

Defendants are Chevron Corporation, the ESIP Investment Committee (the "Investment Committee"), and 20 DOEs (alleged to be "current and former members of the Investment Committee).  FAC ¶¶ 19-24.  Chevron Corporation is the Plan Sponsor and Plan Administrator, and is the sole named fiduciary of the Plan, with the authority to control and manage the operation of the Plan, which includes the authority to designate one or more actuaries, accountants, or consultants as fiduciaries to carry out its responsibilities under the Plan.  FAC ¶¶ 19-20.  The duties that have not been delegated are carried out on behalf of Chevron Corporation by its directors, officers, and employees, including the Investment Committee.  FAC ¶ 20.

The Investment Committee is a group of Chevron Corporation executives who are responsible for establishing and maintaining the Plan's Investment Policy Statement ("IPS"), which provides the criteria for selecting, monitoring, and removing Plan investment options.  FAC ¶ 21.  The members of the Investment Committee are the General Manager of Benefit Plan Investments, the Manager of Reporting and Control, and the Investment Strategist from Chevron Corporation's Treasury Department.  Id. The Investment Committee was not named a fiduciary in the Plan document, but plaintiffs allege that it is nonetheless a fiduciary under 29 U.S.C. § 1002(21)(A) because it has and exercises discretionary authority and control over the administration of Plan investments and investment-related expenses.  FAC ¶ 22.

## BACKGROUND FACTS

During the proposed class period, which began on February 17, 2010, the Plan offered a broad range of investment options for participants, who, pursuant to the Plan's IPS, bear sole responsibility "to make his or her own investment decisions."  IPS, Exh. J

---

Pension Plan, 766 F.3d 1205, 1207-08 n.1 (9th Cir. 2014); see also Tibble v. Edison Int'l ("Tibble II") 135 S.Ct. 1823, 1826 (2015); 29 U.S.C. § 1002(34).

to Declaration of Catalina J. Vergara in support of motion to dismiss original complaint ("1st Vergara Decl."), at 1.  While the mix of investments varied over the years comprising the proposed class period, as of December 31, 2014, the Plan offered participants a choice of 13 Vanguard mutual funds, 12 Vanguard collective trust target-date funds, three non-Vanguard mutual funds, a Dodge & Cox fixed-income separate account, a State Street collective trust, and a Chevron common stock fund.  FAC ¶ 27.

Plaintiffs allege that defendants "caused the Plan's investment lineup to remain largely unchanged" since 2002.  FAC ¶ 28.  But that assertion is contradicted by other allegations showing that during the proposed class period, defendants moved certain funds to different share classes, added funds, and removed funds, see FAC ¶¶ 28, 79-80, 82-84, 86, 101, 102, 109; as well as by the Plan's judicially noticeable IRS Form 5500s for the years 2010-2014, see Defs' Request for Judicial Notice ("RJN") in support of motion to dismiss FAC; Declaration of Catalina J. Vergara in support ("2nd Vergara Decl.") ¶¶ 6-10 & Exhs. D-H thereto; Defs' RJN in support of motion to dismiss original complaint; 1st Vergara Decl. ¶¶ 7-11, Exhs. G-I.

Participants could also choose to allocate up to 50% of the funds invested in their accounts among additional investments offered through Vanguard Brokerage Services, which included several thousand mutual funds from Vanguard and other companies.  See 2nd Vergara Decl. & Exhs. D-H; 1st Vergara Decl. & Exhs. G-I; IPS at 6.

In addition to selecting the funds in the Plan's investment lineup, defendants also chose Vanguard to serve as the Plan's recordkeeper.  FAC ¶ 29.  Plaintiffs allege that Vanguard mutual funds cast proxy votes on behalf of their shareholders for the securities in their portfolio, and that Vanguard "typically votes its proxies 'as a block' to ensure 'the same position being taken across all of the funds.'"  FAC ¶ 32 (citation omitted).

Plaintiffs assert that in voting its proxies, Vanguard "overwhelmingly" supports "management sponsored proposals regarding executive compensation and matters of corporate governance of companies in the Standard & Poor's 500-stock index."  FAC ¶ 33.  They also claim that "[i]n the past year," Vanguard rejected 100% of shareholder-

sponsored proposals seeking to require appointment of an independent chairman of the company's board." FAC ¶ 34. Plaintiffs allege that in casting these proxy votes, Vanguard generally either abstains or votes against proposals requesting financial information regarding risks of climate change to a company or other environmental issues. FAC ¶ 35. Plaintiffs contend that Vanguard "holds" $13 billion of Chevron stock, which makes it the largest institutional holder of Chevron stock, and that Vanguard has consistently voted in favor of Chevron management proposals and against Chevron shareholder-originated proposals. FAC ¶¶ 36-39.

Plaintiffs claim that "conflicts of interest" arose from the fact that Vanguard both owned significant amounts of Chevron stock, and also was doing business with Chevron as the Plan's investment provider. FAC ¶ 40. They assert that defendants could at any time have hired "a pure recordkeeper to provide the same level of services to Plan participants to avoid an arrangement 'infected by conflicts of interest.'" Id.

Plaintiffs assert that defendants breached their fiduciary duties in choosing certain funds in the Plan lineup, and in failing to monitor those funds that were selected for the Plan lineup. First, as in the original complaint, plaintiffs assert that the Vanguard Prime Money Market Fund (the "Money Market Fund") – the Plan's sole conservative capital preservation investment option – was an imprudent choice because of its low return starting in 2008. FAC ¶¶ 41-46. Plaintiffs claim that stable value funds[2] generally outperform money market funds, and that in this case a stable value fund would have been a more prudent choice than a money market fund. FAC ¶¶ 46-70.

Second, plaintiffs allege that a number of the funds in the Plan lineup – including Vanguard funds – imposed unreasonably high investment management fees, including

---

[2] A "stable value fund" is an investment fund in which the principal does not fluctuate in value. Stable value funds are typically invested in safe, short-term instruments such as Treasuries, guaranteed investment contracts, and certificates of deposit. Investors placing money in stable value funds are more concerned about avoiding loss of principal than earning potentially higher rates of return from stocks and bonds that also come with higher volatility. J.Downes & J.E. Goodman, Dictionary of Finance and Investment Terms (Barron's, 9th ed. 2014); see also FAC ¶¶ 47-48.

4

fees that were excessive compared to lower-cost share classes of identical mutual fund options. FAC ¶¶ 79-92. Plaintiffs assert further that certain non-Vanguard funds charged excessive fees compared to what would have been charged for "separate accounts" tailored to the Plan, FAC ¶¶ 93-105; and that certain non-Vanguard funds charged excessive fees compared to "collective trusts," FAC ¶¶ 106-110.

Third, plaintiffs allege that the Vanguard Group, the Plan's recordkeeper, charged excessive fees during the time period it had a revenue-sharing arrangement with Chevron, although they also concede that recordkeeping paid out of revenue sharing is not a per se violation of ERISA's fiduciary requirements. See FAC ¶¶ 112-126. They assert, however, that if recordkeeping is paid for with revenue sharing from asset-based charges, there is a "potential" for excessive recordkeeping fees when assets or contributions increase, and that fiduciaries thus have duty to monitor revenue-sharing amounts to make sure that any increase in assets does not result in excessive recordkeeping fees. FAC ¶¶ 117-120.

Plaintiffs allege that the Plan's recordkeeping fees were excessive because Chevron failed to monitor and control the amount of asset-based revenue sharing fees Vanguard received, and failed to investigate obtaining recordkeeping and investment management services available from other Plan service providers. See FAC ¶¶ 125-126. They also allege that in enabling Vanguard to generate significant revenue from revenue sharing (based on having placed Plan participants in higher-cost funds) Chevron made it possible for Vanguard to offer lower-cost or below-cost services to Chevron for its non-qualified corporate plans, which they claim created a conflict of interest because Chevron used the same recordkeeper for its 401(k) plan. FAC ¶¶ 127-128.

Fourth, plaintiffs allege that Chevron breached its fiduciary duty by imprudently retaining the Artisan Small Cap Value Fund (ARTVX) as an investment option. They claim that this fund "paid an extremely high amount of revenue sharing to Vanguard," and that "retaining this fund in the Plan drove an extremely high amount of revenue sharing to Vanguard." FAC ¶ 130. Plaintiffs assert that this fund significantly underperformed its

benchmark, and that Chevron failed to monitor its performance and should have removed it earlier than April 2014, when they did remove it.  FAC ¶¶ 131-140.

In addition, plaintiffs allege that the Chevron defendants breached their duty to act in accordance with the Plan documents in failing to comply with the Plan's IPS with regard to their choices of the Plan's investment options, in particular, the selection of the Money Market Fund in lieu of a stable value fund, and failure to monitor it, FAC ¶¶ 42, 43, 45, 67-69, 154, and the retention of the ARTVX Fund past the date they removed it from the Plan lineup, and failure to monitor it during that time period, FAC ¶¶ 131, 139, 170. Plaintiffs assert that "[f]iduciaries who are responsible for plan investments governed by ERISA must comply with the plan's written [IPS], insofar as those written statements are consistent with the provisions of ERISA[,]" and that failure to follow a written IPS constitutes a breach of fiduciary duty.  FAC ¶ 144 (citing Cal. Ironworkers Field Pension Trust v. Loomis Sayles & Co., 259 F.3d 1036, 1042 (9th Cir. 2001)).

In sum, plaintiffs contend that the value of their 401(k) retirement accounts – and those of other Plan participants – would have been significantly higher had defendants acted more prudently and chosen funds with higher returns or lower administrative and management fees (or both).  They assert that the Plan fiduciaries are personally liable to make good to the Plan any losses resulting from the alleged breaches of fiduciary duty.

Plaintiffs assert six causes of action in the FAC:  (1) a claim of breach of duties of loyalty/prudence, and failure to comply with the IPS, under 29 U.S.C. § 1104(a), in connection with the selection of a money market fund instead of a "stable value fund;" (2) a claim of breach of duties of loyalty/prudence under 29 U.S.C. § 1104(a), based on unreasonable investment management fees; (3) a claim of breach of duties of loyalty/prudence under 29 U.S.C. § 1104(a), based on excessive administrative fees charged by the Vanguard Group, Inc. (the Plan's recordkeeper); (4) a claim of breach of duties of loyalty/prudence under 29 U.S.C. § 1106(a), based on causing the Plan to engage Vanguard as recordkeeper – alleged to be a "prohibited transaction" constituting an exchange of property between the Plan and a party in interest; (5) a claim of breach of

6

duties of loyalty/prudence, and failure to comply with the IPS, under 29 U.S.C. § 1104(a), in connection with failing to remove the ARTVX Fund from the Plan lineup before they did remove it; and (6) a claim of breach of fiduciary duty by failing to monitor fiduciaries. See FAC ¶¶ 153-179. Defendants now seek an order dismissing the FAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

## CLAIMS OF BREACH OF FIDUCIARY DUTIES UNDER ERISA § 404(a)

Under ERISA, plan fiduciaries are charged with the duty of loyalty, the duty of prudence, the duty to diversify investments, and the duty to act in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1). Plaintiffs allege that the Chevron defendants breached the first, second, and fourth of these.

In accordance with the duty of loyalty, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of administering the plan." Id. § 1104(a)(1)(A). As defined in the Restatement (Third) of Trusts, which is helpful in "determining the contours of an ERISA fiduciary's duty," Tibble II, 135 S.Ct. at 1828, the duty of loyalty prohibits trustees from "engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests." Rest. (Third) of Trusts § 78 (2007).

ERISA also requires that plan fiduciaries use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B); see also Tibble II, 135 S.Ct at 1828 (citing Fifth Third Bancorp v. Dudenhoeffer, 134 S.Ct. 2459, 2465 (2014)). Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983); see also Pension Benefit Guar. Corp. ex

rel. St. Vincent v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 716 (2nd Cir. 2013) (prudence analysis focuses on fiduciary's "conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment").

This duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones.  Tibble II, 135 S.Ct. at 1828-29.  The Uniform Prudent Investor Act confirms that "[m]anaging embraces monitoring" and that a trustee has "continuing responsibility for oversight of the suitability of the investments already made."  Id. at 1828 (citation omitted).  Further, "[w]hen the trust estate includes assets that are inappropriate as trust investments, the trustee is ordinarily under a duty to dispose of them within a reasonable time."  Id. (citation omitted).

Finally, plan fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter."  29 U.S.C. § 1104(a)(1)(D).  However, the duty of prudence "trumps the instructions of a plan document."  Fifth Third Bancorp v. Dudenhoeffer, 134 S.Ct. 2459, 2467 (2014).

**DISCUSSION**

A.    Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to state a claim for relief that is plausible on its face.  Bell Atlantic Corp. v. Twombly,

8

550 U.S. 544, 555, 558-59 (2007); Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); see also In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 679. Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

In addition, while the court generally may not consider material outside the pleadings when resolving a motion to dismiss for failure to state a claim, it may consider matters that are properly the subject of judicial notice. Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Lee v. City of L.A., 250 F.3d 668, 688-89 (9th Cir. 2001); Fed. R. Evid. 201(b). Additionally, the court may consider exhibits attached to the complaint, see Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), as well as documents referenced extensively in the complaint and documents that form the basis of a the plaintiff's claims. See Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007); No. 84 Employer-Teamster Jt. Counsel Pension Tr. Fund v. America W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003). The court "may take judicial notice on its own," and "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c).

Here, defendants request that the court take judicial notice of several Plan-related documents, including IRS Form 5500 filings for the Chevron Employee Savings Investment Plan ("ESIP"), submitted to the U.S. Department of Labor; a February 2012

9

Chevron ESIP participant newsletter entitled "Change is Coming to the ESIP: Your Wealth;" a U.S. Government Accountability Office Report ("GAO Report") dated March 2011, entitled 401(k) Plans: Certain Investment Options and Practices that May Restrict Withdrawals Not Widely Understood; an August 2016 Vanguard newsletter entitled Money Market Reform and Stable Value: Considerations for Plan Fiduciaries; a July 2012 article by Karen P. LaBarge for Vanguard, entitled Stable Value Funds: Considerations for Plan Sponsors; a summary prospectus for the Vanguard Windsor II Investor Shares ("VWNFX"), dated February 24, 2011; a Morningstar report regarding equity ownership of Chevron stock as of September 30, 2016; and the 2011 instructions for IRS Form 5500. See Defs' RJN; Exhs. A-L to 2nd Vergara Decl. Plaintiffs do not oppose the request or otherwise claim that the documents are inaccurate, and the court finds that judicial notice is appropriate.

B.    Defendants' Motion

Defendants argue generally that the FAC realleges the same claims of breach of fiduciary duty as in the original complaint, but still fails to plead cognizable claims. They contend that even with the substantial increase in length from the original complaint, none of the amendments is materially different from the original insufficient allegations, with the exception of the new "prohibited transaction" cause of action, and none cures the deficiencies that the court found required dismissal of all causes of action asserted in the original complaint. Thus, they argue, the FAC should be dismissed for failure to state a claim.

Underlying the arguments in plaintiffs' opposition is an assertion that the court erred in its analysis and rulings in the August 29, 2016 order dismissing the original complaint. As such, it appears to be a procedurally improper motion for reconsideration. For example, plaintiffs contend that the court erroneously required plaintiffs to plead highly detailed factual allegations of the deficiencies in the process by which defendants failed to discharge their fiduciary duties, in order to state their claims. Plaintiffs assert that they should not be required to plead more facts than they did in the original

complaint, because it is defendants – not plaintiffs – who have access to the "inside information" necessary to make out the claims in detail. Nevertheless, plaintiffs argue, their breach of fiduciary duty claims are now clearly plausible, as they have alleged "substantial additional detailed facts" in support of their six causes of action in the FAC, demonstrating that whatever fiduciary process defendants engaged in was "inadequate."

        1.     Claims of breach of duty of loyalty

     In the original complaint, plaintiffs alleged that defendants breached their fiduciary duty of loyalty in connection with the selection of a money market fund instead of a stable value fund; with regard to the selection of fund options with high administrative and investment-management expenses; and with regard to the failure to replace the ARTVX Fund prior to the date they actually did so.

     In the order dismissing the original complaint, the court noted that plaintiffs had alleged throughout the complaint that defendants had breached their fiduciary duties of "loyalty and prudence." The court noted that ERISA § 404(a) distinguishes the duty of loyalty from the duty of prudence; and found that as to the duty of loyalty, the complaint pled no facts sufficient to raise a plausible inference that defendants had engaged in self-dealing or had taken any of the actions alleged for the purpose of benefitting themselves or a third-party entity with connections to Chevron Corporation, at the expense of Plan participants, or that they had acted under any actual or perceived conflict of interest in administering the Plan. See Aug. 26, 2016, Order ("Order") at 8-9.

     Defendants argue that the claims of breach of the duty of loyalty should be dismissed for the reasons stated in the August 26, 2016 Order. They contend that, with the exception of the claim regarding the selection of fund options with high administrative expenses, plaintiffs have added no new allegations sufficient to state a claim, and that with regard to that claim, they have alleged no facts showing any "conflict" on the part of the fiduciaries.

     In the FAC, plaintiffs allege that defendants breached their "duties of loyalty and prudence" in connection with the selection of a money market fund instead of a stable

value fund (first cause of action), see FAC ¶ 154; with regard to the selection of funds with unreasonably high management fees and funds with excessive administrative fees (second and third causes of action), see FAC ¶¶ 158, 162; and with regard to the failure to replace the ARTVX Fund prior to the date they actually did so (fifth cause of action), see FAC ¶¶ 170-171. Each of these four causes of action is alleged in a purely summary and conclusory fashion, and, as in the original complaint, plaintiffs do not distinguish between "prudence" and "loyalty."

Nor do plaintiffs do so in the section of the FAC entitled "Facts Common to All Counts," at least with regard to the first, second, and fifth causes of action. For example, with regard to the selection of the money market fund instead of a stable value fund, plaintiffs allege that "Chevron imprudently and disloyally . . . failed at any time in the past six years to meaningfully investigate the prevailing and persisting economic circumstances and evaluate the prudence of retaining the Money Market Fund as the Plan's only conservative investment option . . . ." FAC ¶ 68. Indeed, the gist of the allegations is that by offering the money market fund as the Plan's only conservative, capital preservation option, from February 2010 to December 31, 2015, defendants breached the duty of prudence. See, e.g., FAC ¶ 70. They allege no facts supporting a claim of breach of the duty of loyalty.

Second, with regard to the allegations of unreasonable investment management fees, plaintiffs allege, for example, that defendants "imprudently and disloyally" provided Plan participants with the more expensive share class of certain funds (instead of a cheaper identical investment). FAC ¶ 79. They also allege that defendants "imprudently and disloyally" offered non-Vanguard mutual funds that charged far higher fees than the fees Vanguard charges for similar investments. FAC ¶ 89. However, these allegations do not distinguish between the duty of prudence and the duty of loyalty, and plaintiffs allege no facts showing a breach of the duty of loyalty.

Third, with regard to defendants' failure to remove the ARTVX Fund from the Plan lineup prior to April 2014, plaintiffs do not allege any facts sufficient to state a plausible

claim of breach of the duty of loyalty.  Indeed, most of the allegations regarding the ARTVX fund do not relate to the duty of loyalty, as distinguished from the duty of prudence.  See, e.g., FAC ¶¶ 131-134, 139.  The only allegation that appears to relate to the duty of loyalty is that "retaining this fund in the Plan drove revenue to Vanguard."  See FAC ¶ 130.

However, this new allegation that defendants were motivated to retain the ARTVX Fund until April 2014 (despite poor performance in 2012 and 2013) in order to drive more revenue-sharing money to Vanguard for its recordkeeping role, allegedly in compensation for its proxy-voting policy, is contradicted by materials on which plaintiffs rely.  Beginning in 2012 (and before the time plaintiffs claim defendants should have removed the ARTVX Fund from the Plan lineup), all revenue sharing from ARTVX was rebated to the Plan.  The 2012 recordkeeping agreement that plaintiffs submitted with their opposition states, "Effective January 1, 2012, an administrative fee reimbursement equal to the amount of all fund subsidies (of any kind) received by Vanguard attributable to a plan's investment in the non-Vanguard funds are to be credited to the applicable Plan."   Declaration of Heather Lea, Exh. 6 at 7.

And even if Vanguard had continued to receive ARTVX revenue-sharing, plaintiffs do not and cannot allege that there were no equivalent small-cap funds paying just as much.  Plaintiffs provide no factual basis for their speculation that Plan fiduciaries tolerated ARTVX's alleged underperformance for the purpose of benefitting Vanguard.  In short, they allege no facts showing a breach of the duty of loyalty.

Finally, with regard to the claim of excessive administrative fees in connection with Vanguard's role as the Plan's recordkeeper, most of the lengthy allegations appear to relate to the purported breach of the duty of prudence.  See, e.g., FAC ¶¶ 113, 116, 117, 120, 125, 126.  Plaintiffs have added the allegation that unlike Plan recordkeeping services, which are paid for by Plan participants, the expenses of administering the corporate plans Chevron maintained for its executives were borne by Chevron; and they assert, on "information and belief," that Vanguard provided "discounted recordkeeping

services" for the non-qualified corporate plans sponsored by Chevron for its executives. FAC ¶ 127.

Plaintiffs claim that Vanguard was able to provide this benefit to Chevron because of "the significant amount of revenue sharing [it] generated from having Plan participants invested in higher cost share classes of its mutual funds as well as other Vanguard investments." Id. "At a minimum," plaintiffs allege, "Chevron's enabling its largest shareholder, Vanguard, to receive millions of dollars of excessive compensation from employees' assets paid for recordkeeping the 401(k) plan, positioned Vanguard to be able to offer lower cost or below cost services to Chevron for its corporate plans[,]" which in turn, plaintiffs claim, "placed Chevron in a position of conflict of interest by using the same recordkeeper for the 401(k) plan." Id. Plaintiffs assert that

> [t]he revenue sharing arrangement for recordkeeping services paid to Vanguard authorized by Chevron benefitted Vanguard, a third-party entity providing services to Chevron, at the Plan's expense because Vanguard's mutual funds, including those offered in the Plan, are collectively among Chevron's largest shareholders capable of exercising tremendous influence relating to matters of Chevron's corporate governance, executive compensation, and environmental policies through proxy voting.

FAC ¶ 128.

Essentially, plaintiffs contend that Vanguard's practice of regularly voting in favor of Chevron on shareholder resolutions motivated defendants to retain Vanguard as the Plan's recordkeeper on a no-bid basis. See FAC ¶ 127. And they claim that choosing the higher-revenue-sharing Vanguard investments furthered this "scheme" to benefit Vanguard in return for Vanguard's favorable voting of its large holding of Chevron stock. See FAC ¶ 128.

This attempt to allege breach of the duty of loyalty fails, because the allegations that Chevron had its own interests and the interests of Vanguard at heart, rather than the interests of the Plan participants, are entirely speculative, and unsupported by any facts, other than "facts" alleged on information and belief or based on pure conjecture. Further, as defendants argue in their motion, even had plaintiffs alleged that Vanguard's proxy

14

voting standards or its arrangement with the non-qualified plans influenced Chevron to retain Vanguard or to inflate the Plan's recordkeeping fees, their theories of "conflict" would still be fundamentally inconsistent with the facts alleged in the FAC – facts that show that, despite any purported "conflict," Chevron repeatedly took actions to reduce Vanguard's fees over the class period, see, e.g., FAC ¶ 80 (moving to lower-cost share class), ¶ 123 (recordkeeping fee of $23/participant as of January 1, 2015).

Plaintiffs have alleged no facts showing that the Plan fiduciaries were aware of Vanguard's allegedly "pro-management" voting position, or that it influenced Chevron's retention of Vanguard in any way. As defendants note in their motion, Vanguard, which plaintiffs' counsel has lauded as the "gold standard" in other similar actions (where Vanguard was not the recordkeeper), is a significant shareholder in just about every public company, simply because of its outsized role in index fund investing. Plaintiffs plead no facts showing that Vanguard did anything unique with respect to Chevron; to the contrary, they allege that Vanguard took pro-management positions for all companies across the S&P 500, and as a block, across all of its funds, see FAC ¶¶ 32-33, regardless of whether it provided retirement services to such companies.

Nor do plaintiffs plausibly plead facts showing a quid pro quo. They allege "on information and belief" that Vanguard provided discounted services to seven non-qualified Chevron plans "due to the significant amount of revenue sharing Vanguard generated from having Plan participants invested in higher cost share classes of its mutual funds as well as other Vanguard investments," FAC ¶ 127, but this is unsupported by facts sufficient to state a claim for breach of the duty of loyalty.

In short, the court finds that the allegations that Chevron had illicit motives to drive higher recordkeeping fees to Vanguard – that the administration of the Plan was infected by "conflict of interests" resulting from Chevron's relationship with Vanguard – are insufficient to state a claim. In particular, plaintiffs allege no facts showing any benefit to Chevron resulting from the Plan's arrangement with Vanguard that Chevron would not have received even absent any such relationship.

United States District Court
Northern District of California

2.      Claims of breach of duty of prudence

a.      Selection of money market fund in lieu of stable value fund

In the first cause of action, plaintiffs allege that defendants acted imprudently in failing to investigate "the merits" of the Money Market Fund as the Plan's sole conservative investment option, and in failing to investigate the availability of alternative conservative investment options available to the Plan – in particular, a stable value fund, which plaintiffs assert would have provided participants a low-risk investment with a predictable higher rate of return.  FAC ¶ 154.

Plaintiffs assert that stable value funds, generally, have a higher rate of return than money market funds.  See FAC ¶¶ 41-70.  Among other things, they allege that defendants failed to consider the Money Market Fund's return to Plan participants as compared to readily available alternatives, which assertion they base on the claim that "when taken together, the superiority of stable value funds over the past ten years" under both lower risk and higher rate of return are clear.  FAC ¶ 54.

Plaintiffs also allege that defendants "failed to conduct a prudent process for determining whether the Money Market Fund should have been the sole conservative investment option" in the Plan, which assertion they claim is supported by interest rates over the past eight years, comments in "respected investment management literature," requirements of the IPS, and the "near collapse of money market funds in 2008."  FAC ¶ 69(a)-(I).

Defendants argue that this cause of action fails to state a claim, for the reasons set forth in the August 29, 2016 Order.  There, the court noted that the IPS required that "[a]t least one fund will provide for a high degree of safety and capital preservation," directed that "all Plan options must be liquid and daily-valued," and promoted participant flexibility in allocating the funds in their accounts.  Order at 13-14.  The court found that the complaint did not set forth sufficient facts to show a breach of the duty of prudence in connection with defendants' selection of the money market fund as the "capital preservation option," and concluded that offering a money market fund as one of an array

16

of investment options along the risk/reward spectrum more than satisfied the duty of prudence, and was consistent with the IPS guidance. Order at 13-14.

The court found further that plaintiffs had pled no facts showing that the Plan fiduciaries failed to evaluate whether a stable value fund or some other option would provide a higher rate of return and/or failed to evaluate the relative risks and benefits of money market funds vs. other capital preservation options. Order at 14. Finally, the court found that plaintiffs' almost total reliance of the relative performance of stable value and money market funds over the previous six years was an improper hindsight-based challenge to the Plan fiduciaries' decision-making.

As noted above, plaintiffs again summarily allege that defendants failed to employ appropriate methods to assess the comparative merits of money market and stable value funds, see FAC ¶ 154, but offer no facts in support of that contention. Instead, plaintiffs have amended the complaint by adding more of the same allegations previously found to be insufficient – primarily allegations emphasizing that money market funds have yielded lower returns than stable value funds over the purported class period. See, e.g., FAC ¶¶ 42-45, 54-60, 65, 69b-d. They allege no new facts showing defendants failed to conduct a prudent process for determining whether the Money Market Fund should have been the sole conservative investment option in the Plan lineup.

A fiduciary may reasonably select an investment alternative in view of its different risks and features, even if that investment option turns out to yield less than some other option. No fiduciary selecting a plan's "safe" option can foresee whether the risks associated with stable value investment will come to fruition, and a fiduciary may reasonably choose to avert those risks in favor of a safer alternative. The materials plaintiffs rely on in the FAC, such as the 2011 GAO Report, see Exh. A to 2nd Vergara Decl., reinforce this point, as they cite the risks, restrictions, and other downsides of stable value funds, and also reflect the fact that there is not always a large performance gap between stable value funds and money market funds.

Similarly, the 2016 Vanguard newsletter, "Money Market Reform and Stable

17

Value: Considerations for Plan Fiduciaries," FAC ¶ 61 n.31, <u>see also</u> Exh. B to 2nd

Vergara Decl., states that "[a]lthough the performance gap between stable value and

money market funds may make stable value appear attractive today, that gap may

narrow in the future as interest rates are expected to increase from their historically low

levels." And the July 2012 article by Karin LaBarge, "Stable Value Funds: Considerations

for Plan Sponsors," FAC ¶¶ 65, 69d, <u>see also</u> Exh. C to 2nd Vergara Decl., states that

"should interest rates rise sharply, money market funds' yields might be higher, over the

short term, than those of stable value funds."

Without more, the mere act of offering Plan participants a money market fund over

a stable value fund as an option providing "a high degree of safety and capital

preservation" is not a fiduciary breach. Indeed, as the court noted in the August 29,

2016, Order, the Ninth Circuit previously rejected an imprudence claim predicated on a

plan fiduciary offering "a short-term investment fund . . . rather than a stable value fund."

<u>See</u> Order at 11 (citing <u>Tibble v. Edison Int'l</u> ("<u>Tibble I</u>") 729 F.3d 1110, 1136 (9th Cir.

2013), <u>vacated on other grounds</u>, 135 S.Ct. 1823 (2015)).

Here, however, instead of relying on the Ninth Circuit, plaintiffs cite an unpublished

decision from the Northern District of Texas, <u>Ortiz v. Am. Airlines, Inc.</u>, C-16-151 (N.D.

Tex. Nov. 18, 2016). Plaintiffs contend that the court in <u>Ortiz</u> "found even fewer detailed

allegations to clearly state a claim of fiduciary breach[,]" and they further assert that "[t]he

allegations so clearly stated a breach, that the court rejected as inadequate a settlement

<u>agreed to by the plaintiffs' attorneys</u>" (emphasis added by plaintiffs). It is clear, however,

that the adequacy of the pleadings was not at issue, and that the court's focus was on the

provisions of the proposed settlement.[3] Thus, <u>Ortiz</u> is not relevant here.

---

[3] In <u>Ortiz</u>, the plan participants challenged the fiduciaries' choice of a credit union demand deposit fund in lieu of a stable value fund, as the "capital-preservation" investment option in the participants' 401(k) retirement plan. Defendants filed Rule 12(b)(6) motions to dismiss, but before the oppositions were due, the parties engaged in private mediation and executed a memorandum of understanding regarding settlement. The plaintiffs then filed a motion for preliminary approval of the settlement and the settlement class.

As the court previously held in the August 29, 2016, order, "[w]ithout some facts that raise an inference of imprudence in the selection of the money market fund – apart from the fact that stable value funds may provide a somewhat higher return than money market funds – plaintiffs have failed to state a claim." Order at 14.  The return of money market funds may at certain time periods be lower than the return of stable value funds, but that does not change the fact that stable value funds take greater risks than money market funds by investing in longer-term securities, as explained by defendants in their motion and detailed in the 2011 GAO Report cited in the FAC.

ERISA requires only that the Plan offer some type of low-risk capital preservation option.  There is no per se rule that a § 401(k) Plan must include a stable value fund as a capital preservation option, even if, in some years, a stable-value fund might outperform some other type of fund.  The court agrees with defendants that the FAC does not allege facts sufficient to state a claim of breach of the duty of prudence in connection with defendants' selection of a money market fund as the low-risk capital-preservation investment option in the Plan investment lineup.

In particular, the FAC pleads no facts showing that the fiduciaries failed to consider a stable value fund, or showing that the process by which the fiduciaries chose the funds was somehow flawed or imprudent.  As plaintiffs are unable to allege any facts showing that the Plan fiduciaries failed to consider the advantages and disadvantages of various types of capital preservation funds before deciding to offer a money market fund to Chevron Plan participants, the court finds that the allegation that defendants failed to offer a stable value fund fails to state a claim for breach of fiduciary duty.

---

In the order at issue, the court requested further briefing regarding the adequacy of the monetary payment, the relationship between the release and the claims being settled, and certain other provisions in the proposed judgment and proposed notice.  The court offered the parties the option of redrafting the settlement agreement and a "rethinking of their wishes as to the contents of the proposed court documents" along with the filing of supplemental information.  The court added that if the parties did not "wish to tackle those projects," they could advise the court and the court would dispose of the litigation in the usual fashion, starting with denying the motion for preliminary approval and setting a briefing schedule for motions to dismiss.

b.     Management fees

In the second cause of action, plaintiffs allege that defendants acted imprudently in selecting plan options that charged unreasonably high annual management fees in light of the availability of far lower-cost versions of the same investments and alternative funds for the Plan.  FAC ¶ 158.

In the August 29, 2016 Order, the court found that the original complaint alleged no facts that were suggestive of imprudent action in connection with this claim.  The court noted that while plaintiffs appeared to be challenging the entire lineup of funds, the challenge was primarily based on speculation that Plan fiduciaries "could have" provided identical, though lower-cost, versions of the funds, or "could have" had the same advisers manage the same funds in a separate account, or "could have" structured the investments differently.  Order at 21.

The court noted that fiduciaries have latitude to value investment features other than price (and indeed are required to do so).  See Order at 18-19 (citing Loomis v. Exelon, 658 F.3d 667, 670 (7th Cir. 2011); Renfro v. Unisys Corp., 671 F.3d 314, 326-27 (3rd Cir. 2011); Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)).  The court also noted that courts have dismissed claims that fiduciaries are required to offer institutional over retail-class funds, or are required to offer a particular mix of investment vehicles, as well as claims that fiduciaries were imprudent in failing to offer cheaper funds.  See Order at 19-20 (citing Tibble I, 729 F.3d at 1135; Loomis, 658 F.3d at 670-72; Renfro, 671 F.3d at 326-28; Hecker, 556 F.3d at 586).

The court found further that the facts as pled reflected that the Plan fiduciaries had provided a diverse mix of investment options and expense ratios for participants, and that the breadth of investments and range of fees the Plan offered participants fit well within the spectrum that other courts have held to be reasonable as a matter of law.  Order at 19-20.  Finally, the court found it inappropriate to compare distinct investment vehicles solely by cost, since their essential features differ so significantly.  In particular, the court noted, mutual funds have unique regulatory and transparency features, which make any

20

1   attempt to compare them to other investment vehicles such as collective trusts and

2   separate accounts an "apples-to-oranges" comparison.  Order at 21-22.

3           In the FAC, as in the original complaint, plaintiffs propose three theories as to why

4   the Plan's investment management fees were unreasonable – that the fiduciaries

5   imprudently offered non-Vanguard mutual fund options when they could have selected

6   comparable Vanguard funds at a lower expense; that the fiduciaries imprudently selected

7   mutual fund share classes with higher expense ratios than other available share classes

8   in the same funds; and that the fiduciaries imprudently offered mutual funds when the

9   Plan could have used less expensive institutional products, such as collective trusts or

10  separate accounts.  See FAC ¶¶ 71-110.

11          Defendants argue that despite having been given an opportunity to plead

12  additional facts in support of this claim, plaintiffs instead opted to stand on their original,

13  deficient allegations.  Defendants assert that apart from two editorial alterations and

14  changes to paragraph numbering, plaintiffs' allegations regarding the fiduciaries' offering

15  of non-Vanguard mutual funds and failure to offer institutional products are identical to

16  the allegations in the original complaint (comparing Cplt ¶¶ 56-50 with FAC ¶¶ 90-92;

17  Cplt ¶¶  60-77 with FAC ¶¶ 93-110).

18          For example, defendants assert that plaintiffs continue to claim that the Plan

19  fiduciaries acted imprudently by failing to choose the lowest share class for certain

20  mutual funds by not choosing cheaper Vanguard funds, see FAC ¶¶ 71-78, 90-92; and

21  that they have attempted to augment this theory by alleging that certain of the higher-cost

22  funds did not offset recordkeeping or administrative costs, see FAC ¶ 81.  However,

23  defendants contend, these new allegations add nothing, as plaintiffs still fail to recognize

24  that price is but one investment feature that fiduciaries are required to consider and

25  weigh in making investment decisions, and that fiduciaries have latitude to value

26  investment features other than price.

27          Defendants argue that while plaintiffs continue to allege that Chevron selected

28  high-priced share classes of mutual funds despite the availability of lower-cost share

classes of those same funds, FAC ¶ 76, and that alternative structures, such as separate accounts, might have reduced fees, FAC ¶¶ 93-96, it is irrelevant that other funds might offer lower expense ratios in situations such as this, where a plan offers a diversified array of investment options.  Defendants assert that to prevail on this claim, plaintiffs must plead facts supporting a strong inference that defendants failed to weigh the costs and benefits of offering the retail-share classes, the non-Vanguard funds, or mutual funds other than other investment vehicles. They contend that since plaintiffs have failed to do this, this cause of action should be dismissed.

In opposition, plaintiffs argue that this cause of action is not a challenge to the selection and maintenance of the Plan's "mix and range of investment options" or a challenge to "the entire lineup of funds," as the court indicated in the previous order. Rather, plaintiffs contend, the FAC addresses specific funds for which defendants had available lower-cost options but instead opted to go with the higher-cost options that were otherwise "the same investment pools in all material respects."

Plaintiffs assert that ten of the Vanguard mutual funds and the three non-Vanguard mutual funds (out of 31 total investment options in the Plan lineup, as of December 2014), provided the exact same mutual fund investment in lower-fee share classes designed expressly for large institutional investors such as the Plan (citing FAC ¶¶ 79, 89, 27).  They contend that providing participants with the more expensive share class of a mutual fund without good reason is a recognized breach.  In support of this proposition, they cite Tibble I, 729 F.3d at 1138-39.

In that portion of the decision, the Ninth Circuit addressed the defendant's argument on cross-appeal that "the district court had erred in concluding – after a three-day bench trial and months of post-trial evidence and briefing – that the company had been imprudent in deciding to include retail-class shares of three specific mutual funds in the Plan menu." Id. at 1137.  However, rather than holding that providing participants with the more expensive share class of a mutual fund without good reason is a recognized breach, as plaintiffs assert here, the Ninth Circuit found that "[t]he basis of

22

liability was not the mere inclusion of retail-class shares, as the court had rejected that claim on summary judgment.  Instead, beneficiaries prevailed on a theory that [the company] has failed to investigate the possibility of institutional-share class alternatives." Id.

This court also previously found that Braden v. Wal-Mart Stores, Inc., 588 F.3d 585 (8th Cir. 2009), on which plaintiffs continue to rely, does not support plaintiffs' claim, because the claim regarding the selection of retail-class mutual funds in that case was accompanied by allegations that the funds paid kickbacks to the plan's trustee in exchange for including the funds in the plan.  See Order at 21 (citing Braden, 588 F.3d at 590, 594-95).  Plaintiffs appear to be attempting to match the allegations in Braden by suggesting that defendants were compensating Vanguard for its publicly disclosed policy of passively voting securities in favor of management positions.  However, this assertion is unsupported by allegation of any facts, and is thus entirely speculative.

It bears repeating that the test of prudence is whether the fiduciaries, "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Donovan, 716 F.2d at 1232, quoted in Calif. Ironworkers, 259 F.3d at 1043.  The court must ask whether the fiduciary engaged in a reasoned decisionmaking process, consistent with that of a "prudent [person] acting in like capacity."  29 U.S.C. § 1104(a)(1)(B).  Here, the FAC does not allege any facts sufficient to create a plausible inference that Chevron failed to investigate the merits of the retail-class funds allegedly included in the Plan lineup, or failed to engage in a reasoned decisionmaking process in selecting the funds.

Again complaining about the August 29, 2016 Order, plaintiffs assert that the court improperly held that defendants' change to lower fund classes was proof of a prudent process.  What the court actually found, however, was that the allegation that the fiduciaries changed the investment options from year to year supports an inference that the fiduciaries were monitoring the investments, and also that the breadth of investments and range of fees in this case fit within the spectrum of what other courts have found

reasonable.  See Order at 20.

Plaintiffs also point to allegations that six of the non-Vanguard mutual funds provided arrangements for the investments managers of those funds to manage the same investments in the Plan's own separate account at published rates that were lower than mutual fund rates, and could have been negotiated even lower.  See FAC ¶¶ 97-102.  Plaintiffs note that defendants did in fact negotiate a separate account arrangement with one of those managers in 2012, reducing the management fee by half.  See FAC ¶ 102.  Plaintiffs also cite to allegations in the FAC that Vanguard provided a "collective trust version" of 13 of the mutual funds, FAC ¶¶ 106-110, but that defendants selected the higher cost version of the target date funds in 2013 and did not move to the lower-cost collective trusts until 2015, FAC ¶ 109.

Plaintiffs contend that all these allegations show that there were specific alternatives available to the Plan which were in substance the same investments with the same investment managers, but at a lower cost, and that defendants either rejected them or ignored them in favor of more expensive versions of the same investments.  Plaintiffs contend that these allegations are not a "broadside" against retail-class mutual funds as categorically imprudent, and are not vague allegations of some lower-cost but different investments available somewhere in the market.  They assert that the allegations are sufficient to plausibly suggest that any fiduciary process was "inadequate" – if not "tainted by failure of effort, competence, or loyalty" (citing Braden, 588 F.3d at 596).

Plaintiffs continue to argue that defendants have an obligation to provide an alternative explanation for the selection of higher-cost share classes for certain funds (which would appear to shift the burden to defendants).  However, plaintiffs themselves have already offered an explanation.  For example, plaintiffs allege in the FAC that prior to March 31, 2012, "Vanguard received 10 bps of internal revenue sharing on the retail (Investor) share class Vanguard mutual funds" in order to pay for recordkeeping.  See FAC ¶ 120; see also Pltfs' Opp. at 20 (detailing 10 bps recordkeeping credit for investor class shares of Vanguard funds); 2nd Vergara Decl., Ex. K at 4 (explaining that the

change to fixed recordkeeping fees will result in the implementation of cheaper share classes)).  This provides an "obvious, alternative explanation" for why the Chevron Plan included retail share classes of certain funds – those share classes paid the Plan's recordkeeping expenses before the Plan's fiduciaries negotiated a flat, per-participant fee in 2012 in exchange for moving to the cheaper, institutional share classes.

This court noted in the prior order that ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach.  See Order at 19.  Plaintiffs apparently wish to relitigate that issue, as they once again argue that their identification of specific alternative investment options distinguishes their facts from the facts in Loomis, Renfro, and Hecker.  Yet plaintiffs do not make clear what distinction follows from identifying particular funds in the Plan lineup that marketed share classes cheaper than those offered – particularly when plaintiffs have acknowledged that the more expensive share classes paid for Vanguard's recordkeeping services.

The court agrees with defendants that the FAC fails to allege facts sufficient to state a claim of breach of the duty of prudence in connection with defendants' selection of funds with allegedly higher management fees over funds with lower management fees. The new allegations simply provide comparisons between funds that were in the Plan lineup and funds that plaintiffs claim were less expensive.  However, what is still missing from the FAC are factual allegations sufficient to create a plausible inference that defendants' process of selecting funds and their monitoring of the funds was imprudent.

The FAC pleads no facts regarding any process for choosing funds, and no facts relating to investigations into the appropriateness of various funds.  The sole basis for this claim is the assertion that there were allegedly lower-cost institutional-class funds available that could have been substituted for certain higher-cost retail-class funds that defendants selected.  The court previously ruled that merely alleging that a Plan offers retail-class rather than institutional-class funds is insufficient to state a claim for breach of the duty of prudence, as fiduciaries have latitude to value investment features other than

price, and indeed are required to do so, and ERISA does not require fiduciaries to "scour the market to find and offer the cheapest possible funds." See Order at 18-20.

c.    Administrative fees

In the third cause of action, plaintiffs allege that defendants acted imprudently in causing the Plan to pay excessive administrative fees to Vanguard during the portion of the proposed class period when the revenue-sharing arrangement for recordkeeping expenses was in effect (February 2010 to March 2012) "through uncapped and unmonitored revenue sharing from Plan investment options and in failing to put Plan administrative services out for competitive bidding on a regular basis, at least every three years." FAC ¶ 162.

Plaintiffs allege that the Plan's recordkeeping fees were excessive in part because defendants failed to monitor the amount of asset-based revenue sharing fees Vanguard received, and failed to investigate "obtaining recordkeeping and investment management services on an open architecture, unbundled basis to ensure Plan service providers were not receiving unreasonable compensation as Plan assets increased." FAC ¶ 125. They allege "on information and belief" that Chevron has never engaged in a competitive bidding process to ensure that the Plan paid reasonable fees for the services provided." FAC ¶ 126.

In dismissing the original complaint, the court found that this cause of action failed to state a claim. See Order at 22-27. Defendants argue that this cause of action still fails to state a claim. In the FAC, as in the original complaint, plaintiffs focus on Vanguard's receipt of recordkeeping compensation via revenue sharing from the Plan's mutual fund investments. See FAC ¶¶ 111-129. Defendants note that plaintiffs acknowledge that nothing in ERISA prohibits such revenue-sharing arrangements. See FAC ¶ 117.

Defendants contend, however, that plaintiffs continue to allege that the Plan fiduciaries acted imprudently by compensating Vanguard for administrative services exclusively through revenue sharing, rather than on a fixed per-participant basis, particularly as Plan assets grew. See FAC ¶¶ 111-115, 125. They note that plaintiffs

also repeat their claim that Plan fiduciaries improperly failed to solicit competitive bids from other recordkeepers. FAC ¶¶ 120, 126.

Defendants argue that the FAC fails to allege facts sufficient to support an inference that the Plan's fiduciaries acted imprudently in failing to monitor fees as Plan assets grew. Moreover, they assert, this court has already held that any such inference would conflict with (1) plaintiffs' admissions that the Plan fiduciaries renegotiated the recordkeeping arrangement with Vanguard four years ago, entering into the kind of flat-fee arrangement that plaintiffs claim should have been the agreement all along; and (2) judicially noticeable Plan filings showing that defendants moved to less expensive share classes of at least four funds even during the 2010-2011 period, prior to the renegotiation. See Order at 26.

Similarly, defendants argue, the allegations suggesting there was some requirement to solicit competitive bids has "no legal foundation." See Order at 26 (noting that nothing in ERISA compels periodic competitive bidding). Defendants assert that at its core, this claim alleges nothing more than a conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable, see Order 25, which they contend cannot sustain plaintiffs' imprudence claim.

As for plaintiffs' new allegations relating to the fees allegedly paid under the revenue-sharing arrangement and a supposed "conflict" that plaintiffs contend clouded the Plan fiduciaries' oversight of recordkeeping fees, see FAC ¶¶ 118-124, defendants contend that these allegations do nothing to save plaintiffs' claim. For example, defendants contend that the allegations regarding the recordkeeping fees allegedly paid by the Plan in 2010 and 2011 do not support an inference of breach of the duty of prudence, as plaintiffs have supported it by offering a "guess" as to the per-participant dollar amount for the Plan's recordkeeping arrangement with Vanguard for 2011 and 2012, in the hope that this guess will show imprudence. See FAC ¶¶ 120-122.

Defendants argue that plaintiffs' guess is not a well-pleaded factual assertion, particularly since it is undermined by judicially noticeable public filings, materials

referenced in the FAC, and even other allegations within the FAC. Defendants point to the allegations that the recordkeeping fees were $167 to $181 in 2010 and 2011, and that those figures are the sum of (1) the direct compensation to Vanguard reported on the Plan's Form 5500s; and (2) purported revenue sharing levels from the funds, expressed in basis points. See FAC ¶ 122. However, defendants assert, the court need not credit those calculations.

First, defendants argue, the "direct compensation" data reported in the Form 5550s includes fees for services other than recordkeeping. Schedule C to the Plan's Form 5500s discloses direct Plan compensation to Vanguard (and other third parties) – e.g., the Form 5500 for 2011 discloses $2,158,730 in direct compensation to Vanguard that year. See 2nd Vergara Decl., Ex. E, at 6. However, the Service Codes on that same Schedule C show that this compensation was not only for recordkeeping services, but also for directed trustee services, participant-level investment advisory services, securities brokerage services, participant loan processing, and investment management fees paid indirectly by the participants. Defendants contend that plaintiffs have lumped all of these fees together and label them "recordkeeping" fees, even though most have nothing to do with recordkeeping.

Second, defendants argue that plaintiffs' "internal revenue sharing" numbers are invalid. Plaintiffs allege that "Vanguard received 10 bps of internal revenue sharing on the retail (Investor) share class Vanguard mutual funds," FAC ¶ 120, and that "the estimated revenue sharing or indirect compensation Vanguard received from its proprietary Investor share mutual fund options," FAC ¶ 122. Defendants assert that the judicially noticeable Summary Prospectuses for the retail mutual funds offered by the Plan before 2012 delineate fund fees, but break them down into "Management Expenses" and "Other Expenses" (citing, e.g., Vergara Decl., Ex. I, VWNFX 2011 Summary Prospectus at 3 (stating "Total Annual Fund Operating Expenses" are 35 basis points, comprising 33 basis points of "Management Expenses" and 2 basis points of "Other Expenses")). Nowhere, defendants argue, are any "internal revenue sharing" expenses

United States District Court
Northern District of California

listed or broken out, and nowhere do plaintiffs provide the source of these numbers.

Third, defendants argue that the Plan's Form 5500s show that the Plan offered the Institutional share class of the Vanguard Balanced Index in 2010 and 2011, at zero basis points, rather than the Investor share class plaintiffs wrongly allege was offered, at plaintiffs' estimate of 10 basis points. See Vergara Decl., Exh. D, 2010 Form 5500 at 34; Exh. E, 2011 Form 5500 at 35. They claim that plaintiffs thus presumably included 10 basis points for that fund (instead of zero) in calculating revenue sharing. They add that plaintiffs' assertion that the revenue sharing arrangements are "exceedingly opaque," FAC ¶ 124, constitutes a concession on the part of plaintiffs that their own estimates lack foundation. Defendants argue that the allegations regarding the amount of the recordkeeping payments need not be accepted by the court, because they are nothing more than conclusory, unwarranted speculations.

Fourth, defendants contend that plaintiffs' "cherry-picking" of recordkeeping fees for two specific years fails to support an inference that the Plan fiduciaries acted imprudently. They argue that there are no facts pled in the FAC from which the court could plausibly infer that the overall compensation paid to Vanguard for recordkeeping services over the term of the agreement – inclusive of prior periods when Plan assets were considerably lower – was excessive. They contend that even were it true that the Plan's asset-based fee arrangement resulted in higher recordkeeping fees in 2010 and 2011 (at least when measured on per-participant, dollar basis), this ignores that asset-based fee arrangements will naturally fluctuate as asset levels rise and fall.

Fifth, defendants argue that, like other allegations in the FAC, allegations re plaintiffs' recordkeeping fees function only in hindsight. They contend that even if the court accepts as true the allegation that the Plan's 2010 and 2011 asset-based fees for Vanguard's recordkeeping services were higher than fixed per-participant recordkeeping rates available in the market for the same package of services, this does not support the inference that Plan fiduciaries must have known the Plan's assets would increase substantially in 2010 and 2011, and the fees (when converted from asset-based

percentages to dollars per participant) along with them.

Defendants contend that there is even less support for the inference that the Plan fiduciaries therefore followed an improper process when continuing the asset-based fee arrangement with Vanguard in 2010 and 2011. Defendants note that the Third Circuit in <u>Renfro</u> upheld dismissal when faced with allegations very similar to those raised by these plaintiffs in the FAC (citing <u>Renfro</u>, 671 F.3d at 326-28).

Finally, defendants reiterate, plaintiffs' own allegations reveal that the Plan fiduciaries were monitoring recordkeeping fees and reduced those fees during the period in question by moving to lower fee share classes and renegotiating recordkeeping fees effective March 31, 2012 (citing FAC ¶¶ 79, 125); <u>see also</u> Order at 26 (finding that these changes plausibly suggest that defendants were monitoring recordkeeping fees).

In opposition, plaintiffs argue that the FAC pleads "detailed new allegations" sufficient to show that Vanguard charged excessive administrative fees (citing FAC ¶¶ 113, 116-123, 125). They point to FAC ¶ 113, where they allege that Vanguard's own chart shows an annual fee rate of $22-$25 per participant. <u>See</u> Lea Decl. Exh. 6. With regard to defendants' contention that plaintiffs' estimate of the amount of the total per-participant compensation is little more than a "guess," plaintiffs point to allegations in FAC ¶ 122 that defendants allowed Vanguard to take $167-$181 per participant from the Plan in 2010 and 2011, well above even the $30.50 fee Vanguard ultimately agreed to when defendants finally eliminated the revenue-sharing arrangement.

As for the amount of the direct compensation reported to the Department of Labor, plaintiffs take issue with defendants' argument that the payments were allocated among different "codes," and were not all directed at revenue-sharing payments. Plaintiffs contend that the fact that "most" of the codes were not for recordkeeping does not mean that "most" of the dollars were not payment for recordkeeping. Plaintiffs claim that because defendants do not disclose that information to plaintiffs, and because plaintiffs are not in a position to determine how much of the total payment actually went to recordkeeping, it is improper for defendants to try to shift the burden to plaintiffs to allege

30

United States District Court
Northern District of California

1  facts that are based on information that is totally within defendants' control.  In plaintiffs'

2  view, "all or nearly all of that amount in fact is recordkeeping compensation" (citing FAC

3  ¶¶ 122-124) – although they point to no facts supporting that theory.

4  Plaintiffs add that even if their calculations have over-estimated Vanguard's

5  compensation by half, the result still exceeds that $30.50 per-participant recordkeeping

6  fee that Vanguard agreed to after defendants eliminated the revenue-sharing agreement.

7  According to plaintiffs, this demonstrates that defendants "likely failed to monitor

8  Vanguard's compensation and allowed Vanguard to be overcompensated."

9  As for defendants' assertion that plaintiffs' calculations regarding the revenue-

10  sharing Vanguard received are "made up," plaintiffs note that defendants concede that

11  revenue-sharing agreements are "exceedingly opaque," but again complain that

12  defendants are still demanding that plaintiffs state the exact amount of revenue sharing

13  Vanguard received.  Plaintiffs contend that the basis for their 10-basis point fee is not "an

14  opaque summary prospectus," but that it comes from "a variety of sources," including

15  defendants' own recordkeeping agreement with Vanguard (Lea Decl. ¶ 7, Exh. 6 at 16);

16  and 17 charts showing revenue-sharing payments from various funds offered as

17  investment options in the Plan.

18  The court finds that the FAC fails to state a claim of breach of the duty of prudence

19  in connection with the recordkeeping arrangement in that existed from February 2010 to

20  February 2012.  The court previously ruled that any claim alleging that Vanguard's

21  recordkeeping fees were excessive failed to state a claim because plaintiffs failed to

22  allege what those fees were and how they were excessive.  See Order at 27; June 22,

23  2016 Hearing Transcript ("TR.") at 35.

24  In an attempt to address this deficiency, plaintiffs have estimated the amount of

25  Vanguard's incremental compensation for recordkeeping services in 2010 and 2011, and

26  have compared that guess to the fees Chevron negotiated with Vanguard in 2012, after a

27  substantial increase in plan assets.  See FAC ¶ 125.  Plaintiffs' opposition confirms that

28  this "estimate" has no factual basis, and that plaintiffs also concede that the source of

their per-participant estimate includes a number of other fees paid to Vanguard that are unrelated to recordkeeping, and that they do not know what portion of the total fees actually relate to recordkeeping.

Even apart from the flaws in plaintiffs' guesswork on the amount of recordkeeping fees in 2010 and 2011 and the non-existent "conflicts," plaintiffs' claim still fails, as it boils down to an assertion that Chevron should have foreseen that the market would go up – and that Plan assets would increase as a result – and renegotiated its asset-based fee arrangement sooner than March 2012.

To reiterate, the question in a claim for breach of the duty of prudence is whether the challenged decision was imprudent at the time the fiduciaries made the decision. See, e.g., Tibble I, 729 F.3d at 1136. Plaintiffs offer no facts supporting their suggestion that the Plan's fiduciaries should have anticipated an increase in Plan assets such that asset-based fees should have been abandoned as early as 2010 or 2011 – rather than in 2012. Moreover, the FAC does not allege that Vanguard (or any other recordkeeper) would have accepted the fees set out in the 2012 agreement any sooner. Instead, plaintiffs assert that "Chevron could have and should have either obtained a readily-available flat fee for recordkeeping services or capped the amount of revenue sharing to ensure that excessive amounts were returned to the Plan." FAC ¶ 125.

Finally, even were plaintiffs' recordkeeping claim viable, it would still fail because it is time-barred. ERISA's statute of limitations requires that an action be filed no more than 'three years after the earliest date on which the Plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113. Here, the FAC challenges the reasonableness of administrative fees charged prior to March 31, 2012, and includes allegations only as to the fees allegedly paid in 2010 and 2011. See FAC ¶¶ 120-122, 124.

At the very latest, plaintiffs were aware of the allegedly excessive recordkeeping fee arrangement in February 2012, when they received the detailed disclosure from Chevron regarding the transition from a revenue-sharing fee agreement for Vanguard's recordkeeping services to a flat fee arrangement. That disclosure indicted that many

32

1   administrative fees were previously covered by higher expenses on certain mutual funds

2   in the Plan and that a quarterly administrative fee would replace the prior structure; and it

3   also listed the precise "before" and "after" fees of every investment affected by the

4   change.  Thus, because plaintiffs had actual knowledge of the facts underlying their claim

5   more than three years before they commenced this action, the third cause of action is

6   untimely and fails as a matter of law.

7       Plaintiffs argue that the Chevron disclosure serves only to undercut defendants'

8   argument that plaintiffs had actual knowledge of the administrative fees paid to Vanguard

9   under the revenue-sharing agreement.  Plaintiffs cite to the first section of this

10  communication, which states in effect that every mutual fund offered by the Plan charges

11  participants an "investment management fee" which varies depending on how much each

12  participant has invested, and which is deducted directly from the fund's investment

13  returns rather than appearing as a separate charge on the participant's statement.

14  Plaintiffs assert that it is implausible for defendants to argue that a Plan communication

15  which in effect states that the participants cannot see the revenue sharing fees paid to

16  Vanguard can also establish that plaintiffs had "actual knowledge" that those hidden fees

17  were excessive.

18      Plaintiffs argue that this February 2012 communication demonstrates that plaintiffs

19  could not have known the amount of compensation paid to Vanguard – much less

20  whether it was excessive.  Moreover, they assert, defendants' "actual knowledge"

21  argument is not properly directed, as plaintiffs' claim is not merely based on the fact that

22  Vanguard was paid through revenue-sharing, but rather that defendants failed to monitor

23  that revenue-sharing and allowed the Plan to overpay Vanguard.  Plaintiffs contend that

24  defendants have provided no evidence showing that plaintiffs had actual knowledge of

25  those facts.  Thus, they assert, ERISA's three-year statute of limitations does not bar any

26  of their claims.

27      The court finds that this cause of action is time-barred.  The FAC challenges the

28  reasonableness of the administrative fees charged by the Plan during the period from

33

United States District Court
Northern District of California

February 2010 through March 31, 2012.  See FAC ¶¶ 120-122, 124.  Plaintiffs received a detailed disclosure from Chevron in February 2012, stating that a portion of Vanguard's mutual fund investment management fees had previously been used to cover plan administrative expenses; that administrative expenses would now be covered by a flat quarterly fee; that as a result, some Vanguard funds would convert to lower-cost share classes; and that non-Vanguard mutual funds which paid Vanguard a portion of the investment management fee for recordkeeping would rebate that money to participants. See 2nd Vergara Decl. Exh. K.

As for plaintiffs' argument that this disclosure was inadequate to comprise "actual knowledge" because the gravamen of their claim is that defendants failed to monitor revenue sharing, plaintiffs plead no facts supporting this claim of failure to monitor. Moreover, the 2012 disclosure establishes that the Plan fiduciaries were monitoring revenue sharing, and negotiating to change the revenue sharing paid to Vanguard. Further, the allegations in the FAC offer no facts beyond what was already available to plaintiffs in the 2012 newsletter.

Plaintiffs' argument is inconsistent.  They contend, for purposes of avoiding the statute of limitations, that they lacked sufficient detail in 2012 to state a claim, and at the same time claim that the same level of detail known to them in 2012 and alleged in the FAC is sufficient to defeat defendants' motion to dismiss.  The court finds that the claim is time-barred under 29 U.S.C. § 1113(2), as plaintiffs possessed the same actual knowledge in 2012 that is the basis of their claim today.

With regard to the argument regarding the recordkeeping fees in 2010 and 2011, plaintiffs' allegations are little more than guesses, and are either invalid or relatively incomprehensible, for the reasons argued by defendants.  Most importantly, none of the allegations are sufficient to support an inference that the overall compensation paid to Vanguard was excessive, particularly given that the fees were based on the asset levels, and there was no way to know before the fact what the asset levels in 2010 and 2011 would be.  There are no facts showing that the fiduciaries acted imprudently at the time.

34

d.      Claim re delay in removing the ARTVX Fund

In the fifth cause of action, plaintiffs allege that defendants breached their duty of prudence, including the duty to monitor Plan investments, and also breached the terms of the IPS, by providing and failing to remove as a Plan investment option the Artisan Small Cap Value Fund ("ARTVX Fund"), despite the fund's underperformance compared to its benchmark, peer group, and similar lower-cost investment alternatives.  FAC ¶ 170.  Defendants removed the fund from the Plan lineup in April 2014.

Plaintiffs assert that the ARTVX fund significantly underperformed its benchmark (the Russell 2000) for four out of the five years preceding its removal, and that it ranked in the bottom 1/10th of the Morningstar category ranking for 1-, 3-, and 5-year periods between March 2010 and March 2014.  FAC ¶¶ 132-133.  Plaintiffs claim that defendants should have removed this fund – which had been part of the Plan lineup since 2003 – earlier than April 2014.  See FAC ¶¶ 134-140.

Defendants argue that this cause of action fails to state a claim.  In the original complaint, plaintiffs alleged that in addition to imposing an excessive fee structure, the ARTVX Fund significantly underperformed its benchmark and alternatives available to the Plan, such that a prudent fiduciary would have removed it before the Plan fiduciaries acted to do so.  The court found that this cause of action did not plead facts sufficient to state a claim.  See Order at 31.  Rather, the court found, the allegations were sufficient to create a plausible inference that the Plan fiduciaries were attentively monitoring the Fund, as they removed it in April 2014, and did so while it was still outperforming its benchmark on a long-term trailing basis.  See id.

The court also found that plaintiffs' characterization of the fund's performance included a substantial period after the defendants had removed the fund, and that plaintiffs appeared to concede that the period of "consistent" underperformance did not begin until "around 2012."  Order at 31.  The court reiterated that poor performance, standing alone, is not sufficient to create a reasonable inference that plan fiduciaries failed to conduct an adequate investigation – either when the investment was selected or

35

1   as its underperformance emerged – and that ERISA requires a plaintiff to plead some

2   other indicia of imprudence.  Id.

3       In the FAC, plaintiffs again allege that the ARTVX Fund was one of the most

4   expensive offered to Plan participants.  They assert that the IPS requires careful and

5   continuous monitoring of the performance of each Plan investment option, and that here,

6   despite the fact that the ARTVX Fund underperformed its benchmark (Russell 2000), and

7   consistently ranked at the bottom of its peer group for 15 of 17 consecutive quarters,

8   defendants retained the ARTVX Fund as a Plan investment until April 1, 2014.  Plaintiffs

9   allege further that there were numerous prudent alternatives to this low-performing fund

10  available to the Plan.  FAC ¶¶ 132-138.

11      Defendants argue, however, that plaintiffs simply continue to allege – and only

12  with the benefit of hindsight – that the fund's allegedly "dismal" performance is enough to

13  state a claim.  Defendants contend that, as the court previously noted, the common

14  practice of retaining investments through periods of under-performance as part of a long-

15  range investment strategy is plainly permitted.  See Order at 31-31.  Defendants argue

16  that plaintiffs' hindsight judgments of the Plan fiduciaries' monitoring process, including

17  allegations regarding investments that would have made more money than the ARTVX

18  fund, are thus insufficient to state a claim.  See Order at 32.

19      In opposition, plaintiffs argue that the FAC alleges sufficient facts to show that the

20  ARTVX Fund performed poorly for several years, and that there were other, better-

21  forming alternatives that the Plan fiduciaries could have offered Plan participants.  They

22  note that the IPS requires careful and continuous monitoring of the performance of each

23  Plan investment option, and argue that a Plan investment must be removed if it fails to

24  meet an investment strategy objective or if the investment strategy of the fund is no

25  longer appropriate for the plan.

26      Plaintiffs contend that the ARTVX Fund's underperformance is well-documented in

27  the FAC, and that there were many reasonable and prudent alternatives to this poorly

28  performing fund.  They assert that they have alleged sufficient facts to state a claim that

defendants acted imprudently in failing to remove the ARTVX fund earlier than they did.

The court previously held that to state a viable claim, plaintiffs must plead some other objective indicia of imprudence.  See Order at 31.  The court agrees with defendants that the fifth cause of action fails to state a claim that the Plan fiduciaries were imprudent in failing to remove the ARTVX Fund from the Plan lineup sooner than they did.  Plaintiffs continue to base this claim solely on the fact that the Fund did not perform well, which approach the court has already rejected.  See Order at 31-32.  This cause of action was adequately disposed of in the August 29, 2016 Order, see Order at 27-32, and plaintiffs have not added any new facts sufficient to save it.

      3.     Claim re "prohibited transactions"

In the fourth cause of action, plaintiffs assert a new claim – that by engaging Vanguard to serve as the Plan's recordkeeper, defendants "caused the Plan to engage in a transaction that they knew or should have known constituted a direct or indirect furnishing of services between the Plan and a party in interest" in violation of ERISA § 406, 29 U.S.C. § 1106(a)(1).  FAC ¶¶ 166-167.  Specifically, plaintiffs allege that defendants caused the Plan to engage in a transaction that they knew or should have known constituted an exchange of property between the Plan and a party in interest, which is prohibited by § 1106(a)(1)(A), or a direct or indirect furnishing of services between the Plan and a party in interest, prohibited by § 1106(a)(1)(C), and/or a transfer of Plan assets to a party in interest, prohibited by § 1106(a)(1)(D).  See FAC ¶ 167.

Defendants argue that this newly-added cause of action fails to state a claim and must be dismissed.  First, defendants note that ERISA creates an exemption from "prohibited transactions" by explicitly permitting a plan to contract or make "reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."  29 U.S.C. § 1108.

Second, defendants contend that plaintiffs' new "prohibited transaction" claim is barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113, for claims of breach of

fiduciary duty.  Here, defendants assert, plaintiffs are explicit about the transaction they purport to be prohibited – it is "causing the Plan to engage Vanguard to be the Plan's recordkeeper."  FAC ¶ 166-167; see also FAC ¶ 28 ("Chevron selected Vanguard as the Plan's recordkeeper" in 2002).  Thus, defendants assert, this new cause of action is time-barred.

In opposition, plaintiffs do not respond to the argument that ERISA explicitly permits a plan to contract for "services necessary for the establishment or operation of the plan."  Rather, they focus on the question whether the claim is time-barred.  They assert that the "duty to monitor," which was recognized by the Supreme Court in the 2015 decision in Tibble II, applies equally to transactions under § 1106 (citing In re Northrop Grumman Corp. ERISA Litig., 2015 WL 10433713 at *25-26 (C.D. Cal. Nov. 24, 2015)).

Plaintiffs contend that their "prohibited transaction" claim concerns the agreement under which defendants hired Vanguard to serve as the Plan's recordkeeper, which they assert resulted in Vanguard receiving excessive compensation for its services.  They point to Northrup Grumman, where the court concluded, in ruling on defendants' motion for summary judgment, that "[g]iven the fiduciaries' continuing duty to avoid transactions violating the duty of loyalty, plaintiffs can argue that each payment pursuant to [a prohibited transaction] during the limitations period constituted a breach of fiduciary duty and a prohibited transaction."  Id., 2015 WL 10433713 at *26.  Based on this, plaintiffs argue that the "prohibited transaction" claim is timely.

The court agrees with defendants that the fourth cause of action fails to state a claim.  Chevron selected Vanguard as the Plan's recordkeeper in 2002, FAC ¶ 28, and the complaint in this case was filed in 2016.  Unlike a claim for breach of fiduciary duty, which turns on the prudence of the decisionmaking process, a violation of § 1106 occurs when a fiduciary takes a particular action with respect to a Plan.  It makes no sense to assert a claim of duty to monitor a past occurrence, and the Ninth Circuit has opined that there is no such thing as a "continuing" prohibited transaction – as the plain meaning of "transaction" is that it is a point-in-time event.  See Wright v. Ore. Metallurgical Corp., 360

38

F.3d 1090, 1101 (9th Cir. 2004).

Thus, the cited ruling in <u>Tibble II</u> is inapplicable as it tethered to the "duty to monitor" incorporated into § 1104's duty of prudence, not the "prohibited transactions" element of § 1106, even where the alleged prohibited transaction is the mere retention of a third-party service provider more than six years prior to the claim. <u>See</u> <u>Tibble II</u>, 135 S.Ct. at 1828-29.

The <u>In re Northrup Grumman</u> decision is also inapposite, as there is no allegation here of "annual proposals that set forth a schedule of services" that Vanguard would provide each year. <u>See</u> <u>id.</u>, 2015 WL 10433713 at *26. Rather, plaintiffs allege only that engaging Vanguard in 2002 was a prohibited transaction. Plaintiffs have offered no theory as to how a continuing duty to monitor affects a static decision made 14 years prior to the claim that plaintiffs have asserted.

4.      Claim re failure to comply with "duty to monitor" fiduciaries

In the sixth cause of action, plaintiffs allege that "to the extent that any of Chevron Corporation's fiduciary responsibilities were delegated to another fiduciary, Chevron's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally." FAC ¶ 176. Plaintiffs claim that Chevron failed to monitor its appointees and their fiduciary process. FAC ¶ 177.

Defendants argue that this cause of action fails to state a claim. They note that plaintiffs have not revised this cause of action since the court ruled on the prior motion to dismiss, and contend that this unrevised "duty to monitor" claim remains both derivative and flawed, as the court held in the order dismissing the original complaint. <u>See</u> Order at 33-34.

In opposition, plaintiffs make the same argument they made in opposition to the motion to dismiss this cause of action as pled in the original complaint – that because the FAC states valid causes of action for breach of fiduciary duty, the derivative claim must also survive dismissal. They add that because they lack the "inside information" regarding how defendants actually monitored the fiduciaries, they cannot be expected to

allege such facts in the complaint.

As both plaintiffs and defendants agree, this claim is derivative. Because none of the other causes of action states a claim, the sixth cause of action must also be dismissed.

### CONCLUSION

In accordance with the foregoing, the court finds that defendants' motion must be GRANTED. With regard to the claims for breach of the duty of loyalty (first, second, third, and fifth causes of action), the FAC fails to allege facts sufficient to raise a plausible inference that defendants took any actions for the purpose of benefitting themselves or some third party with connections to Chevron, at the expense of Plan participants, or that they acted under any actual or perceived conflict of interest.

With regard to the claims of breach of the duty of prudence, the FAC fails to state a claim for the reasons set forth above. The derivative claim of failure to monitor fiduciaries fails because the FAC does not state a claim for breach of fiduciary duty.

Because plaintiffs have failed to correct the deficiencies identified by the court in its prior order, and because the sole new claim fails for the reasons set forth in this order, the court finds that further leave to amend would be futile. The dismissal is WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: May 31, 2017

_____
PHYLLIS J. HAMILTON
United States District Judge